WARREN P. NEAL, and another,

*vs.*

DAVID B. FLINT.

Hancock.    Opinion June 1, 1895.

*Sales.    Incomplete Contracts.    Collateral Agreement.    Evidence.*

Where the whole agreement in reference to the sale of property is embraced in a written bill of sale, parol evidence is inadmissible to contradict, vary or modify the contract which the parties have thus reduced to writing.

But if the original contract is verbal and entire, and a part only of it is reduced to writing and embraced in such bill of sale, it is competent to show that fact; or that there was a distinct collateral agreement, not inconsistent with the terms of the written stipulations of the parties, and which constituted in part the consideration of the written agreement, or operated as an inducement for entering into it.

This is an exception to the general rule which prohibits the introduction of parol evidence to contradict, vary or modify written contracts.

In such case the written contract is deemed to be only partially reduced to writing, and the collateral undertaking or stipulation exists in parol.

ON MOTION AND EXCEPTIONS.

This was an action of assumpsit for non-delivery of goods sold, and an independent and collateral, verbal guaranty on the part of the defendant that the goods and chattels, so sold and described, comprised all and the same that were at Winter Harbor in October, 1890, some seven months before the sale.

Plea was the general issue.    The verdict was for the plaintiff.

In 1889 one Roderick Pendleton gave to the defendant as security for a loan, a mortgage of certain boats, canoes and appurtenances.

In the fall of 1890, the mortgage still subsisting, the plaintiff Neal being employed by Pendleton assisted in storing at Winter Harbor what remained of the boats, &c., some having been disposed of by Pendleton in disregard of the mortgage.

In November, 1890, the defendant began foreclosure, and in February, 1891, the time of redemption having expired, he instructed one Smith acting as his agent to take possession of them.

In the spring of 1891, the parties meeting in Boston, the defendant negotiated with the plaintiff, Neal, to sell him the property, and on May 15th, the defendant, in consideration of twenty-five hundred dollars in notes gave to the plaintiff, Neal, a written bill of sale.

On the following day the plaintiff, Neal, returned to Mr. Flint's house accompanied by Charles H. Wood and requested certain alterations to be made in the bill of sale. Some formal changes were agreed to, including the naming of a consideration and the insertion of special covenants of warranty, and a new bill of sale embodying these changes was then and there written by Mr. Wood, being copied from first bill of sale and such changes as Mr. Flint would permit, signed by Mr. Flint, delivered to and received by the plaintiff, Neal.

(Bill of Sale.)

"Know all men by these presents: That I, D. B. Flint, of Boston, in the County of Suffolk and State of Massachusetts, in consideration of one dollar and other valuable consideration paid by Warren P. Neal, of Steuben, Washington County, Maine, and Fred Shaw, of Gouldsboro, Hancock County, Maine, the receipt whereof is hereby acknowledged, do hereby grant, sell, transfer, and deliver unto the said Neal and Shaw, the following goods and chattels, namely, all the boats, canoes, sails, oars, paddles, fittings and fixtures of every kind — more or less — as the same now lie at Winter Harbor, in the care of Charles E. Smith, and which were covered by a mortgage from Roderick Pendleton to me, under date June 26, 1889, and recorded in the records of the town of Gouldsboro, also all boat-stages, houses and fittings as they now are at Bar Harbor, the same being free from all claims of all persons by, through or under me. Said mortgage having been foreclosed by my attorneys for breach of condition, and the said property coming to my possession by due process of law. Said Neal and Shaw assuming all liability for rents, wharfage, or charges from the first day of May, 1891. It being understood and agreed that one good boat, and one canoe, with all fittings for both and all in good

condition are reserved. To have and to hold all and singular the said goods and chattels to the said Neal and Shaw and their executors, administrators, and assigns, to their use and behoof forever. And I hereby covenant with the grantees that I am the lawful owner of the said goods and chattels; that they are free from all incumbrances, that I have good right to sell the same as aforesaid, and that I will warrant and defend the same against the lawful claims and demands of all persons, claiming by, through or under me. In witness whereof I, the said D. B. Flint, have hereunto set my hand and seal this 16th day of May, in the year one thousand eight hundred and ninety-one.

D. B. Flint. (L. S.)"

"Signed sealed and delivered in presence of Charles H. Wood."

The plaintiff immediately after took possession of the property.

But it appeared that between the time they were stored at Winter Harbor in the fall and the time of his taking possession in the spring, some of the property had been lost or stolen without the knowledge of either party to the suit.

Thereupon the plaintiffs claimed that they had bought and were entitled to all of the boats, &c., that had been stored in the fall, and brought this action.

The plaintiffs offered evidence of certain conversations between Neal and defendant and between Neal, Wood and the defendant, before and at the time of the execution of the second bill of sale.

This testimony was admitted subject to the defendant's objections. The testimony so admitted subject to the defendant's exceptions was as follows :

*Warren P. Neal*, one of the plaintiffs. (Direct.)

" Ques. Now at the first talk with Mr. Flint did you have any talk referring to what boats were there? Ans. Yes, sir.

" Ques. At the time of the talk, with reference to Pendleton's ownership of them, or to Pendleton's mortgage of them to Mr. Flint? (Objected to.. Admitted. Defendant excepts.) Ans. Yes, sir.

" Ques. Now, then, won't you kindly state what conversation was had there between you in reference to the identification of the property? What was said there between you and Mr. Flint

about what property was there at Winter Harbor that you were buying?—(Objected to. Admitted. Defendant excepts.) Ans. Well, we talked about what I put in there in the fall.

"Ques.  *By the Court:*—What did you say about what you put in there?  Ans.  He asked me if I wanted to buy the business, and I told him I did if I could pay for it all right. Then he asked me if I wanted to make him an offer for the business, in cash or notes, and how much.  I told him that depended on what I got.  I said, 'If I can have all Mr. Pendleton has given you a mortgage of it, it makes one thing, and if I have got to take just what I put in there, that is another.'  I says, 'I had rather find out first, before I make you an offer, whether I can raise the money or not.'

"Ques.  That is all there was said at that time?  Ans.  That is about all that I remember.

"Ques.  How soon afterwards did you have another conversation with Mr. Flint?  Ans.  I went again in three or four days, perhaps a week afterwards, to see him.  I was waiting to see a party that was coming through Boston, and then I was going to let him know what I could do about raising the money. As soon as I found out I went and told him I could not raise the money, but I could raise the notes for him if he would take these indorsements.  I named the parties.  He said he was going to Winter Harbor in a few days to look after his boats there, and when he got back he would let me know, and during his time down there he would see my mother and Mr. Shaw and see what they could do, and when he got back he would let me know.

"Ques.  What, if anything, did he state about going to Winter Harbor, and his object in going there?  (Objected to. Admitted.  Defendant excepts.)  Ans.  He told me that he was going to Winter Harbor to see about the boats, and see if they were all right and everything; he hadn't been there since they had foreclosed, and didn't know what they had done and when he got back he would let me know, and I told him I would like to have him look the boats over.  I told him I understood this sloop Eunie had been drifting around, full of ice, etc., and

full of water, etc.  He said that couldn't be, for he had paid
Mr. Sumner for hauling the boat out and taking care of her.
He said he would go down and see, and when he got back he
would let me know what kind of shape they were in.

  "Ques.  What next did you hear about it?  Ans.  When he
got back from Winter Harbor he let me know and I went out
to Commonwealth Avenue to see him.

  "Ques.  That was when he had got back from Winter Harbor?
Ans.  That was when he had got back.

  "Ques.  That was the third conversation?  Ans.  Yes, sir.°

  "Ques. 'What was it?  Ans.  I asked him how the boats were,
and he said just as I left them in the fall.  I asked him if the cat
boats were covered up, and he said they were; that Mr. Smith
took the boards off one and laid it on the wharf; that one the cat
boat's halyards were off.  I told him that didn't amount to much,
only a dollar or two anyway.  He said the boats were all right and
in the care of Mr. Smith, and : 'I will assure you they are all
right so far as he has had charge of them.'

  "*Mr. Deasy:*  This is all subject to our objection.

  "*Witness*:  Then I asked him if he saw my mother and
Shaw, and he said he did.  I don't know as I remember just
the talk that he told me that they made with him, but there was
something in relation to this boat business, about the notes, etc.,
and then he asked me to make him an offer for this business,
that is, provided I could get these notes all right.  He wanted
me to make him two offers, one for the boats as I put them in
there in the fall, and one for the boats he had a mortgage of and
get what I could that Mr. Pendleton had sold.  I told him that
made a difference ; if I could have what I put in there and they
were all right and straight, why I would give him $2500 for
what I put in in the fall.  I said I had a list of what I put in
and he said he had a list of the same.  He didn't show me his
and I didn't ask to see it.  I told him if I could have all that he
had a mortgage of I would give $2800; he made the remark
that he didn't want to put Pendleton to any trouble because he
had trouble enough.  He said, 'It was the worst thing I ever
done when I lent him the thousand dollars.'  He says, 'I will
take you at your $2500 offer.'

"*The Court:* Now, what was that offer? Ans. That was an offer for what I put in there in the fall, and had a list of.

"*The Court:* You told him that? Ans. Yes, sir.

"*The Court:* And that is what he said to you? Ans. Yes, sir.

"Ques. Now, to go back a moment, have you that list you made in October, 1890, of the boats and fittings, with you? Ans. Yes, sir. (Produces list.)

"Ques. This is the list that you took in October, 1890? Ans. Yes, sir.

"Ques. Of the Pendleton boats, etc.? Ans. Yes, sir."

Said list offered in evidence by counsel for plaintiff. (Objected to. Admitted. Defendant excepts.)

*Charles H. Wood*, called for the plaintiffs.

"Ques. Without asking detailed questions, will you state the circumstances of, and the wording of a conversation which took place in Boston, 1891, where Mr. Neal and Mr. Flint and you were present, as regards the sale of certain property from Mr. Flint to Mr. Neal? (Objected to as incompetent, irrelevant and immaterial. Admitted. Defendant excepts.) Ans. I went to Mr. Flint's house with Mr. Neal, at Mr. Neal's request, and a letter which I had received from down east from my brother-in-law, and we made known our business to Mr. Flint, and were taken by him to his office.

"Ques. Was that in his house? Ans. That was in his house, at 360 Commonwealth Avenue. I told him that I had been asked to come there by Mr. Neal, as well as my brother-in-law, Mr. Shaw, for the purpose of getting a proper bill of sale ; that I did not think this writing he had given Mr. Neal hardly covered the ground, and that I would like to have some additions made to it. Then, after we made known our business, I think we went up stairs to an office. I remember of sitting down to a desk and I did the writing at the dictation of Mr. Flint. I suggested certain changes that we wanted in the bill of sale. The minor ones he permitted me to make. He allowed me to put in Mr. Shaw's name with Mr. Neal's as one of the

grantees, and he also allowed me to recite in the bill of sale a consideration, which was not in the paper which he had written without a blank and given to Mr. Neal. I called his attention after we had got those points adjusted, to the fact that the description was not very specific. I suggested that it was only very general, and he shook his head at once and said he couldn't make any changes of that kind. He said something to this effect —I don't remember the exact words, but to this effect, that, 'No,' he says, 'I can't put in any names or any articles.' He says, 'Mr. Neal knows more about that than I do.' And Mr. Neal spoke up at that point and says, 'Yes, Mr. Flint, I know what I put in there,' and Mr. Flint answered and says, 'Whatever you put in there last fall is there now.' · And he simply refused to make any further additions to the bill of sale. I think he did allow me to put in the covenant which the blank called for of his title to it by the quitclaim, saying, I think he used the remark that he would not make any warranty deed of anything. I think he used that remark, and I remember also my calling his attention to the fact that this description was somewhat uncertain as it read in his bill of sale. He says, 'Everything will be all right.' I says, 'Yes, Mr. Flint, so long as you are alive I have no doubt but what you will carry out your agreement with Mr. Neal; I have no doubt any agreement you have made with Mr. Neal will be carried out, but,' says I, 'life is uncertain, and perhaps if it should pass into other hands, it might not be carried out as you and Mr. Neal have agreed.' I pressed the matter as much as I thought was becoming and he refused to make any changes and it was dropped at that point. I think I interlined in the original bill of sale — if I remember right I made one bill of sale, which has been shown here, and took Mr. Flint's original writing which he gave to Mr. Neal and made such interlineations as he permitted me to make. That is about all I can remember of the matter."

The counsel for the defendant requested the following instruction :

"If Mr. Neal, or Mr. Wood on Mr. Neal's behalf, requested Mr. Flint to specify in writing an agreement as to the quantity

of the articles, and Mr. Flint refused to do so and expressly
stated that he would not warrant anything, and Neal closed the
trade and accepted the bill of sale as written with that statement
of Flint's, then Neal is thereby estopped from afterwards setting
up any previous verbal warranty as to the quantity."

The presiding justice thereupon said : "Gentlemen, I give
you that instruction, but I also say to you that the element in
it which is controlling is whether or not the plaintiff accepted it
in full satisfaction and compliance with his bargain."

The jury decided the issue in favor of the plaintiffs and assessed
damages in the sum of one hundred and forty-two dollars and
seventy-eight cents.

To the admission of the foregoing testimony and instruction
given to the jury, the defendant took exceptions.

The issue, as submitted to the jury, by the presiding justice
appears in the following portions of his charge :

"I now refer to the interview when the bargain is said to have
been struck. The question for you is to determine what that
bargain was. There was a bargain of sale at that interview ;
there was no sale, because the sale was not completed until later ;
but it is admitted by both sides that a bargain for sale was made.
'A bargain was struck,' in the language of the counsel for the
plaintiff. Now, what was that bargain? The plaintiff, Neal,
says that he had taken an account of what boats were there at
Winter Harbor in a certain store house, or a storing place, that
he had a list of them, and that he went to Mr. Flint to purchase
them. He says that Mr. Flint wanted a proposition from him to
purchase all the property that he had acquired under his mort-
gage, or to purchase only that which was stored there in the fall.
That is what Mr. Neal says. He states that he offered to give the
defendant, for all the property to which he took title under the
Pendleton mortgage, the sum of $2800, and to give him $2500
for all that he had stored in the fall, and that Mr. Flint agreed
to sell him all that were stored in the fall for $2500. . . . .

"Now, gentlemen, when two parties make a verbal agreement
or trade that is to be reduced to writing, and the writing is
afterwards made, that writing is conclusive of the transaction

and binding upon the parties, and they must be forever estopped and held by its terms and conditions. That rule applies in this case so far as that writing does cover the whole contemplated contract between the parties. . . . .

"So, gentlemen, determine, in the first place, what the trade was. You will determine whether the parties committed to paper the whole transaction, whether they substituted the written instrument for all the bargain they had previously made. If they did, the plaintiff cannot prevail. If they did not, and the bargain was to sell all that lay at Winter Harbor, and the defendant had distinctly agreed with the plaintiffs to sell them all that was at Winter Harbor, representing that at that time all the boats were there that were at Winter Harbor, guaranteeing them to be there, then the plaintiffs can recover. But I am bound to say to you that it is not necessary in order to hold a man by warranty for him to say, 'I warrant.' If I convey an article to you by a representation as to quality concerning which you have had no opportunity to discover, and my representation to you is of that character which leads you to believe it and to rely upon it as containing that quality, and you purchase, why then, gentlemen, the jury would have a right to say that I meant to warrant, and actually did warrant the article. . . .

"Well, gentlemen, when that last bill of sale was given, the defendant's attention was called to the imperfect description of these articles, and he was asked to add a list which would operate to convey those articles to the plaintiffs and he declined to do so. Now, what is the significance of that to your minds? If he had made his contract before to give a writing of that sort you will consider whether when the first writing was accepted and he was asked to put in a second writing and refused to do it, the plaintiff Neal went away submitting to that agreement, agreeing to take his rights under that bill of sale; or whether he went away without agreeing to it and without submitting to it, having done all that he could to get in all that the man had agreed to sell and had determined to enforce his contract against Mr. Flint and to have the property that was contained on his list."

*J. A. Peters, Jr., and Charles H. Wood,* for plaintiffs.

*L. B. Deasy and A. W. King,* for defendant.

The previous conversations having been reduced to a written contract, that contract in the absence of fraud is the best proof of their agreement, and it cannot be varied or contradicted by parol evidence. *Bell* v. *Woodman,* 60 Maine, 467.

The parties having reduced their contract to writing, their rights must be governed by and depend upon its terms as therein expressed, irrespective of any parol evidence of what was intended or what took place previous to or at the time of the making of the contract. *Grant* v. *Frost,* 80 Maine, 204.

The parties to a written contract have made it the authentic memorial of their agreement and for them it speaks the whole truth upon the subject matter. *McMaster* v. *Ins. Company,* 55 N. Y. 234. That a contemporaneous agreement of warranty cannot be engrafted by oral evidence on a written instrument is well settled in Massachusetts. *Boardman* v. *Spooner,* 13 Allen, 361.

In *Frost* v. *Blanchard,* 97 Mass. 157, the defendants sought to prove by parol a warranty of quantity in relation to goods conveyed by writing signed by both parties making no mention of warranty. The court say : " A previous or contemporaneous warranty cannot be engrafted by parol evidence upon a written contract. In our opinion the agreement merged all antecedent negotiations and stipulations, whether oral or written, and must be taken to be the complete expression of the entire bargain with each other, by which alone their rights and liabilities are to be determined."

Counsel also cited : *Keller* v. *Webb,* 126 Mass. 394 ; *Howe* v. *Walker,* 4 Gray, 318 ; *Dutton* v. *Gerrish,* 9 Cush. 89 ; *Libby* v. *Dickey,* 85 Maine, 367 ; *Stubbs* v. *Pratt, Id.* 429. Writing is not a bill of parcels as in *Hazard* v. *Loring,* 10 Cush. 268 ; and *Dunham* v. *Barnes,* 9 Allen, 354.

SITTING : PETERS, C. J., WALTON, EMERY, FOSTER, WHITE-HOUSE, STROUT, JJ. EMERY and WHITEHOUSE, JJ., dissenting.

WISWELL, J., having been of counsel, did not sit.

FOSTER, J.   The plaintiffs entered into negotiations with the defendant whereby he was to sell them certain boats, canoes, sails, oars, paddles, furniture and other fittings then stored at Winter Harbor.   Two or three interviews were had in Boston, the defendant's place of residence, before the bargain was struck.

It became a question of fact at the trial what the contract was,— whether the bill of sale which the defendant gave to the plaintiffs embraced the whole contract between the parties, or whether there was a collateral agreement incidentally connected with the stipulations contained in the bill of sale and not in conflict therewith.

This was important as bearing upon the question of admissibility of evidence which was admitted, and to the admission of which exceptions were taken by the defendant.   If the whole agreement in reference to the sale of the property was embraced in that bill of sale, then no parol evidence was admissible to contradict, vary or modify the contract which the parties had thus reduced to writing.   But if the original contract was verbal and entire, and a part only of it was reduced to writing and embraced in the bill of sale, it was competent to show that fact, or that there was a distinct collateral agreement, not inconsistent with the terms of the written stipulations of the parties, and which constituted in part the consideration of the written agreement, or operated as an inducement for entering into it.   *Bonney* v. *Morrill*, 57 Maine, 368, 373, and cases cited.   See *Grant* v. *Frost*, 80 Maine, 202 ; *Bradstreet* v. *Rich*, 72 Maine, 233, 237, and cases cited.   Brown on Parol Evidence, ch. XII, § 50, and cases cited.   Stephen Evidence, Art. 90. Taylor Ev. § 1038.

The property in relation to which the contract was made had been stored the fall before at Winter Harbor.   The plaintiffs claim that the defendant agreed to sell all the articles that were stored in the fall.   On the other hand the defendant contends that the bargain was that he was to sell the plaintiffs what was at Winter Harbor on May 16th, the time when the contract was entered into, with no right to anything that might be missing from the articles stored the fall before.

The bill of sale contains no particular enumeration of the articles sold, the language being, "All the boats, canoes, sails, oars, paddles, fittings and fixtures of every kind, more or less, as the same now lie at Winter Harbor," &c. The plaintiffs' contention at the trial was that there was an oral promise, warranty or understanding on the part of the defendant to the effect that all the boats, etc., put into the boat-house at Winter Harbor by Neal, one of the plaintiffs, were there at the time of the execution and delivery of the bill of sale.

If such a promise or agreement was in fact made, were the plaintiffs entitled to the benefit of it under the rules of evidence? We think they were.

The contract or promise relied on was a collateral agreement incidentally connected with that which had been reduced to writing, and not inconsistent with it. The bill of sale was silent as to quantity. The words "as they now lie" refer to quality or condition rather than quantity and number. No part of the writing covered this collateral stipulation set up by the plaintiffs. Consequently evidence of it was admissible, and it was for the jury to determine whether it was proved or not. *Farwell* v. *Tillson*, 76 Maine, 227, 239.

The general rule is that parol evidence cannot be received to contradict or vary the terms of a written contract, and that when an agreement is reduced to writing it must be considered as expressing the ultimate intention of the parties to it, and therefore, in the absence of fraud, (*Prentiss* v. *Russ*, 16 Maine, 30,) parol evidence is not to be admitted to alter or modify the terms or legal effect of it. The parties having reduced their contract to writing, their rights must be governed by and depend upon its terms as therein expressed, irrespective of parol evidence of what was intended, or what took place previous to or at the time of making the contract.

But there are exceptions to this general rule which permit parol evidence of engagements collateral to, or independent of, the provisions expressed in the written agreement and not within its terms, although made at the same time and affecting the rights of the parties in relation to the subject matter of the writing. In such it is deemed only partially reduced to writing, and the

collateral undertaking or stipulation exists in parol. *Chapin* v. *Dobson*, 78 N. Y. 74; *Potter* v. *Hopkins*, 25 Wend. 417; *Lindley* v. *Lacy*, 17 C. B. (N. S.) 578 (112 E. C. L. 578); *Jeffery* v. *Walton*, 1 Starkie, 267 (2 E. C. L. 108); *Willis* v. *Hulbert*, 117 Mass. 151; *Nickerson* v. *Saunders*, 36 Maine, 413; *Goodspeed* v. *Fuller*, 46 Maine, 144; *Bradstreet* v. *Rich*, *supra*. In *Dorr* v. *Fisher*, 1 Cush. 271, 273, Chief Justice Shaw uses this language: "But a warranty is a separate, independent, collateral stipulation, on the part of the vendor, with the vendee, for which the sale is the consideration, for the existence or truth of some fact, relating to the thing sold." Benj. on Sales, § 610.

Greenleaf thus expresses the exception to the rule: "Nor does the rule apply in cases where the original contract was verbal and entire, and a *part only* of it was *reduced to writing*." 1 Gr. Ev. § 284 a. And this court in *Bonney* v. *Morrill*, 57 Maine, 373, states it thus: "There is no rule of evidence which precludes the defendant from asserting and proving by oral testimony, any distinct and valid parol contract of the plaintiff, made at the same time and not reduced to writing, which is not in conflict with the written agreement and which undoubtedly operated as an inducement to the defendant to enter into it."

The exception to the admission of the testimony of Charles H. Wood cannot be sustained for the reasons already stated,— (1) It related to the alleged collateral agreement relied on by the plaintiffs; (2) To a conversation between the defendant and one of the plaintiffs which was first partially drawn out by defendant's counsel upon cross-examination of Neal. By the introduction of a portion of such conversation, although upon cross-examination, the other party had a right to the whole of it, and to prove what in fact the conversation was. *Williams* v. *Gilman*, 71 Maine, 21; *Oakland Ice Co.* v. *Maxcy*, 74 Maine, 294; *Mowry* v. *Smith*, 9 Allen, 67, 68.

The exception in relation to the requested instruction is not insisted upon. It was given as asked for with qualifications that were proper to prevent the jury from being misled as to the issue involved.

After a careful examination of the evidence we perceive no reason why the verdict should be disturbed upon the motion for a new trial. While it was more or less conflicting upon the vital points in controversy, it was sufficient upon which to found a verdict.

*Exceptions and motion overruled.*

EMERY and WHITEHOUSE, JJ., dissenting.

This contract of sale was evidenced by a written instrument which is not a mere bill of parcels or incomplete memorandum, but is a full, formal bill of sale apparently complete, and containing various stipulations. The opinion seems to hold that oral evidence should be received to add to these written stipulations an oral stipulation of warranty or guaranty concerning the property sold. From this we dissent.

While the cases cited in the opinion sustain the general proposition that independent, collateral stipulations may be shown by oral evidence in addition to those expressed in writing, they do not to our minds sustain the particular proposition, that an oral warranty or guaranty concerning the property sold, is a stipulation independent of and collateral to the contract of sale, and one which may be added by parol to those expressed in the writing.

The very purpose of writing out the various stipulations of a contract is to avoid disputes as to what stipulations were or were not in fact finally made. When a warranty or guaranty as to the subject matter of a sale is made during the negotiations for a sale, it becomes a part and a material part of the contract of sale. It is a stipulation that would naturally be expressed when the final terms of the sale are reduced to writing. If it be omitted from the written instrument made and adopted by the parties as the evidence of their contract, it should be held as finally omitted from the contract itself. We think the rule thus stated is fully sustained by the great weight of authority. We cite the following cases, and refer to the numerous other cases cited in these : *De Witt* v. *Berry*, 134 U. S. 306 ; *Seitz* v. *Brewers' Co.* 141 U. S. 510 ; *Van Winkle* v. *Crowell*, 146 U. S. 42 ;

*Graham* v. *Eisner*, 28 Ill. App. 269 ; *Rodgers* v. *Perrault*, 41 Kansas, 385 ; *Johnson* v. *Powers*, 65 Cali. 179 ; *Boardman* v. *Spooner*, 13 Allen, 361 ; *Frost* v. *Blanchard*, 97 Mass. 155 ; *Galpin* v. *Atwater*, 29 Conn. 93, 100 ; *Wilcox* v. *Cate*, 65 Vt. 478 ; *Thomson* v. *Gortner*, 21 Atlantic, Rep. 371 (Md.). In *Naumberg* v. *Young*, 44 N. J. L. 331, the court in an elaborate opinion reviewed the cases and in vigorous language affirmed the rule that an oral warranty or guaranty could not be added to a contract expressed in writing. Indeed, our own court has recognized and acted upon this rule. In *Storer* v. *Taber*, 83 Maine, 387, there was a written bill of sale less formal and less complete than the one in this case. The court said (p. 388,) : " It was correctly ruled at the trial that the writing did not contain a warranty of soundness, and that none could be affixed to it by parol."

In *Osgood* v. *Davis*, 18 Maine, 146, it was held that an oral warranty of title could not be added to a written assignment of a stock certificate. The court cited as authority, *Powell* v. *Edmunds*, 12 East, 6, in which it was held that an oral warranty of quantity could not be added to the written conditions of a sale of timber.

To this wholesome rule we think the court should adhere. We deprecate any departure from it.