**INTERSTATE INDUSTRIAL UNIFORM RENTAL SERVICE, INC.**

v.

**F. R. LEPAGE BAKERY, INC.**

Supreme Judicial Court of Maine.

April 15, 1980.

Argued Jan. 2, 1980.

Decided April 15, 1980.

Cole & Daughan, Francis P. Daughan, orally, Wells, for plaintiff.

Marshall, Raymond, Beliveau, Dionne & Bonneau, John B. Beliveau, orally, Lewiston, for defendant.

Before McKUSICK, C. J., and WERNICK, GODFREY, NICHOLS and GLASSMAN, JJ.

GODFREY, Justice.

In September, 1972, Interstate Industrial Uniform Rental Service, Inc. (Interstate) began an action against F. R. Lepage Bakery, Inc. (Lepage) for breach of contract. Lepage counterclaimed, alleging breach by Interstate. After acceptance of a referee's report, judgment was entered for Lepage on both the complaint and counterclaim. We deny Interstate's appeal and affirm the judgment.

Before January, 1971, Lepage bought the uniforms for its route salesmen from Benoit's in Portland. Each salesman was then responsible for cleaning and maintaining the uniforms issued to him by Lepage. Some of the salesmen having expressed discontent with that arrangement, on January 26, 1971, Lepage executed a three-year written agreement with Interstate whereby Interstate agreed to supply clean uniforms of its own to Lepage's salesmen at a weekly rental to be paid by Lepage.

Under the agreement, which was on a printed form supplied by Interstate, Interstate was to provide a weekly pick-up and cleaning service and maintain the uniforms. By a handwritten insertion on the printed contract form, Interstate agreed to "buy garments of men they will service at invoice". The invoice prices of the existing Lepage uniforms were not set forth in the contract. From testimony at the hearing the referee found it was the intent of the

parties that Interstate would purchase the existing Lepage uniforms, supplement them with new uniforms and, as the Lepage uniforms wore out, replace them with new Interstate uniforms, Lepage receiving a monthly credit toward the contract amount based on the "market value" of their uniforms.

During negotiations, the parties discussed the Lepage uniforms that had been purchased from Benoit's. Interstate representatives were shown a sample of one of those uniforms. According to the Lepage representatives, the parties agreed before execution of the agreement that the uniforms supplied by Interstate would be of comparable quality to the Benoit uniforms. Representatives from Interstate denied any such agreement, insisting that they showed Lepage officials a sample of the Interstate uniforms, which were so obviously inferior to Benoit's in quality of fabric that Interstate would never have agreed that its new uniforms would be of comparable quality. Lepage officials agreed that the Interstate uniforms were of inferior quality but denied ever looking at a sample before signing the written agreement.

Testimony before the referee disclosed that during negotiations Interstate agreed to perform certain duties that were not provided for in the contract; namely, to sew route book pockets into the uniforms, affix emblems, tag the uniforms with the employees' names and locker numbers, and supply lockers for the uniforms.

After Interstate began supplying uniforms to Lepage's employees, the employees began to complain about their quality and about Interstate's service and maintenance. Officials of Lepage related the complaints to Interstate, and several meetings took place to work out the problems. Lepage's route salesmen continued to complain. Lepage officials testified that morale of the salesmen was adversely affected because other bakery route salesmen wore uniforms of higher quality. Because the problems continued after the meetings with Interstate officials, the president of Lepage terminated the contract by letter dated June 26, 1972, declaring that, effective July 1, 1972, Lepage would no longer accept the service of Interstate.

Interstate brought this action alleging that Lepage "breached" the contract by refusing to accept services after July 1, 1972. Lepage denied that it had wrongfully terminated the contract and counterclaimed, alleging that it legally terminated the agreement because Interstate had breached by not supplying uniforms of comparable quality to the Lepage uniforms and that Interstate had not properly maintained the uniforms.

After an agreement for reference was filed, the case was ordered to be heard by a referee. After hearing, the referee found that the written contract was silent as to the quality of the uniforms to be rented, that the parties agreed orally that the uniforms were to be substantially equal in quality to Lepage uniforms, and that Interstate violated the oral agreement by supplying inferior uniforms.

The referee recommended judgment for the defendant Lepage on Interstate's complaint. On the counterclaim, he recommended judgment for Lepage for one dollar. Although some damages resulted to defendant, he said, "the evidence lacks the specificity which is requisite if a money award is not to be based on surmise and conjecture".

Interstate objected to the referee's report in Superior Court. The justice, denying the objections and adopting the referee's findings and recommendations, gave judgment for defendant on plaintiff's complaint and judgment for one dollar for defendant on its counterclaim, with costs. Interstate seasonably appealed. Lepage does not cross-appeal.

Interstate argues that there was no evidence to support the referee's findings (1) that the January 26 contract was silent as to quality of the uniforms to be supplied, and (2) that there was a separate oral agreement that the Interstate uniforms would substantially match the old Lepage uniforms in quality. The contract set forth the following schedule to govern the cost of

replacing new garments if lost or destroyed by Lepage employees, and specified the kind of fabric in the replacement garment: [1]

| | | | |
|---|---|---|---|
| Chino Shirts | ... 3.50 | Nylon-Rayon Lined Jackets | 10.00 |
| Chino Pants | ... 4.50 | Dacron-Rayon Pants | ...... (8.00) |
| Coveralls | ...... 6.50 | Dacron Pants | ...........10.00 |
| Shop Coats | .... 5.75 | Dacron Jackets | .........(12.00) |
| | | Liner | ..................3.00 |
| ................. | | Dacron-Cotton Shirts | ..... (4.50) |
| ................. | | Dacron-Cotton Pants | ...... 5.75 |

The dollar amounts for dacron-rayon pants, dacron jackets and dacron-cotton shirts were circled in ink on the contract form. The implication is clear that the parties agreed on the fabrics shown opposite the circled amounts as the fabrics for the uniforms to be supplied under this contract.

In reaching his conclusion, the referee found the January 26 agreement to be silent on the quality of the Interstate uniforms. He appears to have found that there was a parol agreement, not merged or integrated in the January 26 writing and hence not discharged by it, that the Interstate uniforms would be substantially equal in quality to the existing Lepage uniforms; in other words, that Interstate was bound by a parol express warranty of future substantial equivalency in the quality of the two sets of uniforms. The principal question on appeal is whether the parol evidence rule should have been applied to bar reliance on that oral promissory warranty.

There was testimony by Lepage officials, which the referee apparently believed, from which he could have rationally inferred the existence of a parol agreement by Interstate that the new uniforms would be substantially equal in quality to the old. His finding that such a parol agreement existed had some support in the evidence. The question is whether he erred in giving effect to that collateral oral agreement about quality, which he had thus found to exist, in

view of the fact that it created an added obligation on Interstate not provided for by the written agreement.

██ With respect to contracts, the parol evidence rule is carefully stated in *Restatement (Second) of Contracts* § 239 (Revised Tent. Drafts Nos. 1–7, 1973), as follows:

(1) A binding integrated agreement discharges prior agreements to the extent that it is inconsistent with them.

(2) A binding completely integrated agreement discharges prior agreements to the extent that they are within its scope.

(3) [not here applicable]

As Comment *a* to section 239 makes clear, the parol evidence rule is not a rule of evidence but of substantive law;[2] it is not a rule of interpretation but a rule defining the proper subject matter for interpretation. In order to apply the provisions of section 239, a court must first make a determination that there is a binding integrated agreement and then must ascertain its relationship to the prior parol agreement. It is therefore necessary in this case to determine first whether the January 26 contract was an "integrated agreement" and, if so, to what extent.

██ Agreements and negotiations of the parties leading up to the January 26 writing may be properly considered in order to establish whether the writing was a binding integrated agreement and, if so, whether it was completely or partially integrated. *Restatement (Second) of Contracts* § 240 (Revised Tent. Drafts Nos. 1–7, 1973). From even a cursory review of the evidence, it is clear that the January 26 writing did not integrate completely all the understandings of the parties. It contained

1. The contract form contained blanks to be filled in to show the particular details of a rental transaction, such as the number of shirts, pants, jackets, etc. to be cleaned per employee of the customer, the number of employees, and the total charge per week.

2. Often, the court seems to regard the face of the writing itself as the sole test of its completeness as an integration. The fact that this is quite unsound should not lead us to overlook

the fact that the face of the document may weigh heavily on the issue of completeness of integration. It is only one of the evidential factors; and until that issue is determined, the "parol evidence rule" as it is commonly stated does not purport to exclude any testimony. 3 A. Corbin, *Contracts* § 585 at 485 (1961).

See also J. Sweet, *Contract Making and Parol Evidence: Diagnosis and Treatment of a Sick Rule*, 53 Cornell L.Rev. 1036, 1038–39 (1968).

no reference, for example, to Interstate's initial duties: sewing special pockets into the uniforms, tagging the uniforms, and supplying lockers; by referring to "invoice" price, it left to future determination the exact pricing of the old Lepage uniforms that Interstate promised to buy. It is equally clear, however, that the agreement did integrate the parties' understanding on certain matters; *e. g.*, the weekly rental cost of Interstate uniforms, the type and number of garments to be issued to each employee of Lepage, the number of employees to be served, and the arrangements for handling lost and destroyed uniforms. For purposes of determining the applicability of the parol evidence rule, the writing of January 26 must be classified as a binding, partially integrated agreement, and it therefore discharges prior agreements only to the extent that it is "inconsistent" with them. *Restatement (Second) of Contracts* § 239(1), set forth above.

Nothing in the language of the January 26 agreement explicitly addressed the quality of the Interstate uniforms, and the referee found that the agreement was silent on the point. However, Interstate argues that the effect of designating in the agreement the types of fabric to be used for pants, jackets and shirts was to create an inherent limitation on the quality of the Interstate uniforms in terms of their durability and resistance to wrinkling, dirt and stains, which limitation was inconsistent with any parol agreement that the uniforms would substantially equal the Benoit uniforms in quality.

In effect, Interstate contends that the January 26 agreement was not really silent with respect to the quality of the uniforms to be supplied by Interstate and hence discharged the asserted prior parol agreement. *Restatement (Second) of Contracts* § 239(1), *supra*.

■ In the absence of any evidence of record to the contrary, we must assume that the referee, in concluding that the written agreement was "silent" with respect to the quality of the Interstate uniforms, found that the contract references to types of fabric did not merge or integrate by implication any prior oral agreement of the parties as to quality. We have no basis in fact for holding, as a matter of law, that he was wrong in doing so. We cannot say, as a matter of law, that it was impossible for uniforms of the designated fabrics to be substantially as good as the Benoit uniforms had been. Thus we cannot say that the referee erred in treating the contract designation of fabrics as not having a necessary bearing on the quality of the uniforms. At the very least, we could not hold the referee to have been wrong if he concluded that the parties themselves did not intend, merely by their designation of fabrics, to agree to a limitation on quality, especially when that designation seemed to be merely incidental to the contract arrangements for recouping the value of employees' lost or destroyed uniforms.

■ The present case is one of first impression in Maine. We have on the one hand a binding, partially integrated agreement, on a printed form supplied by the promisor, for successive bailments of goods and for services related to those goods, without any express warranty of quality of the goods or services and without any *merger* or integration clause in the agreement; on the other, a prior promissory oral warranty of quality of the goods, going beyond any warranty that would be implied by law. There is no controlling precedent in Maine on the applicability of the *parol* evidence rule to the oral warranty in this situation. Where a written contract "appears complete on its face," this Court has usually manifested reluctance to permit enforcement of a prior oral agreement when the effect of enforcement would be to enlarge the duties explicitly undertaken by a party to a written contract. *E. g.*, *Hoyt v. Tapley*, 121 Me. 239, 116 A. 559 (1922) (written contract calling for future delivery of potatoes to the buyer; parol evidence rule held to bar seller from showing prior oral agreement that buyer would supply the cars in which seller was to ship); *Johnson v. Burnham*, 120 Me. 491, 115 A. 261 (1921) (written contract whereby plaintiff agreed

to set up portable saw mill on defendant's land and saw defendant's logs at five dollars "per M"; plaintiff sawed 640 M of defendant's logs; *held*, parol evidence rule rendered inoperative an alleged prior oral agreement of defendant to deliver 1,500 M of logs to the mill); *Bassett v. Breen*, 118 Me. 279, 107 A. 832 (1919) (memorandum of contract to sell certain "land and buildings, to include five lots 50 x 120, house, 3 hen houses and shed"; parol evidence rule rendered inoperative alleged prior oral agreement of vendor that certain chattels on the premises were included in the contract.) With those cases, however, must be compared *Burrowes Corp. v. Read*, 151 Me. 92, 116 A.2d 127 (1955) (parol evidence rule held not to bar operation of prior oral agreement, consistent with written contract, that contract would not become binding until happening of a certain future event); *Vumbaca v. West*, 107 Me. 130, 77 A. 642 (1910) (written memorandum of contract to lay blocks of a cement house, memorandum being silent as to thickness of blocks; oral agreement that blocks were to be one foot thick held operative); *Neal v. Flint*, 88 Me. 72, 33 A. 669 (1895) (written bill of sale, signed in May, of "all the boats, canoes, sails, oars, paddles, fittings and fixtures of every kind—more or less—as the same now lie in Winter Harbor;" parol evidence rule did not bar giving effect to "an oral promise, warranty or understanding" on the defendant's part that all the boats put into the boat house at Winter Harbor the preceding October were still there when the bill of sale was executed.) The last case cited above, *Neal v. Flint*, is the only Maine case that can possibly be regarded as involving a warranty, and the warranty there (if it was one) was assertive or representational, not promissory.[3]

**3.** See Mechem, *Implied and Oral Warranties and the Parol Evidence Rule*, 12 Minn.L.Rev. 209, 222–24 (1928), suggesting that the parol evidence rule has been less strictly applied to bar representations of fact ("assertive warranties") than promissory warranties.

**4.** See generally 3 A. Corbin, *Contracts* ch. 26, esp. § 585 (1960).

Professor Williston cites many sales cases in other states for the proposition that even where a writing stating the terms of a sale contains no express warranty and no merger clause, "extrinsic evidence of an oral warranty generally is excluded." 4 S. Williston, *Contracts* § 643, at 1080 (3d ed. 1961).[4] However, he continues:

The trend of the decisions shows some qualification of this doctrine. The principles applicable to contracts only partially reduced to writing find frequent application, and where the writing on its face does not appear to be a complete statement of the contract or the purchase, or is a mere receipt, memorandum or order as distinguished from a written contract, or is a promissory note which states that the note is given as the price of a chattel conditionally sold, the reason for applying the parol evidence rule is lacking and extrinsic evidence of a warranty is generally admitted.

The principle thus stated is one very difficult of application, and the decisions are not easy to reconcile on their facts. It must be remembered, too, that the parol evidence rule also applies to a partial integration to the extent that it is integrated. 4 S. Williston, *supra*, at 1082–83 [footnote omitted].[5]

The confusion in many of the cases deciding on the applicability of the parol evidence rule is at least partly attributable to careless phrasing of the rule as if it were a rule of evidence; *e. g.*, "Parol evidence is not admissible to vary, add to, or contradict the terms of a written contract." That oversimplified formulation has obscured the correct meaning of the rule and has led to errors in determining its applicability in particular situations. J. Sweet, *supra* n. 2, at 1049.

**5.** See also, *Rogers v. Zielinski*, 92 R.I. 479, 170 A.2d 294 (1961) (Bill of sale for an automobile containing a covenant of title but no disclaimer of warranty, *held*, not to integrate entire agreement; an express parol warranty was given effect.)

We are influenced in our decision by the fact that the Uniform Commercial Code, title 11 of the Maine Revised Statutes, has adopted the approach to the parol evidence rule that is taken by sections 239 and 240 of the *Restatement (Second) of Contracts.* Section 2–202 of the Code provides as follows:

Terms with respect to which the confirmatory *memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with re-spect to such terms as are included there-in may not be contradicted by evidence of any prior agreement or of a contempora-neous oral agreement but may be explained or supplemented

(1) By course of dealing or usage of trade (section 1–205) or by course of performance (section 2–208); and

(2) By evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Article 2 of the Code is not directly applicable to the present case, which involves an agreement, not for sale of goods, but for successive future bailments of goods and for services on those goods. The arrangement between Interstate and Lepage appears to have been a "transaction in goods", with regard to which section 2–102 of the Code provides as follows:

Unless the context otherwise requires, this Article applies to transactions in goods; it does not apply to any transaction which although in the form of an unconditional contract to sell or present sale is intended to operate only as a security transaction nor does this Article impair or repeal any statute regulating sales to consumers, farmers or other specified classes of buyers.

The first clause of section 2–102 seems to leave it to judicial choice whether to apply particular provisions of article 2 in cases not predominantly involving sales of goods. Most courts that have considered the effect of section 2–102 have treated the first clause as an invitation to reasoning by analogy in non-sales-of-goods cases whenever similarity of policy considerations suggests that an application of Code provisions would promote desirable uniformity of rules and principles governing other kinds of commercial transactions as well as sales. *See, e. g., Glenn Dick Equipment Co. v. Galey Constr., Inc.,* 97 Idaho 216, 541 P.2d 1184 (1975); *Newmark v. Gimbel's, Inc.,* 54 N.J. 585, 258 A.2d 697 (1969); 1 R. Anderson, *Uniform Commercial Code* § 2–102: 4 & 5 (2d ed. 1970 & Cum.Supp.1979).

Though it does not involve a contract for sale of goods, the instant case is one in which the correct solution is strongly suggested by the provisions of section 2–202 of the Code, governing the relationship between written contract and prior parol agreement. No good reason appears for according the parol agreement found by the referee less effectiveness than it would have had under the Code if a contract to sell goods had been involved, the facts being otherwise similar.

It was not clearly erroneous for the referee to find on the evidence that Interstate had agreed that its uniforms would be substantially as good as the former Lepage uniforms and to decide that the written agreement was silent as to quality of the uniforms. On the facts as he found them, he was correct in treating the oral agreement about quality as surviving the integration of other agreements of the parties into the January 26 writing.

The entry is:

Appeal denied.

Judgment affirmed.

All concurring.