**INHABITANTS OF the CITY OF SACO, et al., Plaintiffs,**

v.

**GENERAL ELECTRIC CO., Defendant.**

**Civ. No. 90–0020 P.**

United States District Court,
D. Maine.

Nov. 15, 1991.

Edward L. Caron, Saco, Me., Jeffrey A. Thaler, Berman & Simmons, P.A., Lewiston, Me., for plaintiffs Inhabitants of City of Saco, Inhabitants of Biddeford, Biddeford–Saco Solid Waste Committee.

David P. Silk, Joseph J. Hahn, Bernstein, Shur, Sawyer & Nelson, Charles J. Micoleau, Robert E. Stevens, Curtis, Thaxter, Stevens, Broder & Micoleau, Portland, Me., for defendant Maine Energy Recovery Co.

Joseph J. Hahn, Bernstein, Shur, Sawyer & Nelson, Portland, Me., for defendants Kuhr Technologies, Inc., KTI Energy, Inc., KTI Holdings, Inc.

George S. Isaacson, Brann & Isaacson, Lewiston, Me., Zachary R. Karol, Neal A. Rosen, Bingham, Dana & Gould, Boston, Mass., for defendant General Elec. Co.

## MEMORANDUM AND ORDER ON DEFENDANT GENERAL ELECTRIC'S MOTION FOR SUMMARY JUDGMENT AND FOR DISMISSAL

GENE CARTER, Chief Judge.

In this action Plaintiffs seek to recover in both tort and contract for injuries arising from the alleged failure of a waste-to-energy plant. The first six counts of the complaint have been dismissed after settlement by Order of this date.[1] The remaining eight counts seek relief from Defendant General Electric Co. (GE). Cross-claims by the other Defendants against GE are currently the subject of ongoing arbitration proceedings. Defendant General Electric with this motion seeks summary judgment on Counts VII–X, and dismissal of Counts XI–XIV, all against GE.

A motion for summary judgment must be granted if "[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court of Appeals for the First Circuit has aptly articulated the legal standard to be applied in deciding motions for summary judgment:

> [T]he movant must adumbrate 'an absence of evidence to support the nonmoving party's case.' *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 [106 S.Ct. 2548, 2554, 91 L.Ed.2d 265] (1986). When that is accomplished, the burden shifts to the opponent to establish the existence of a fact issue which is both 'material,' in that it might affect the outcome of the litigation, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 [106 S.Ct. 2505, 2510, 91 L.Ed.2d 202] (1986); *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904 [96 S.Ct. 1495, 47 L.Ed.2d 754] (1976), and 'genuine,' in that a reasonable jury could, on the basis of the proffered proof, return a verdict for the opponent. *Anderson,* 477 U.S. at 248 [106 S.Ct. at 2510]; *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988). It is settled that the nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue. 'The evidence illustrating the factual controversy cannot be conjectural or

---

1. These counts sought relief from Defendants Maine Energy Recovery Co. (MERC), Kuhr Technologies, Inc. (KTI), KTI Energy, Inc., and KTI Holdings, Inc. Due to the dismissal of the claims against these Defendants, the Court has taken the liberty of restyling the case.

problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial.' *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989). As the Supreme court has said:

> [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Anderson*, 477 U.S. at 249–50 [106 S.Ct. at 2511].

*Brennan v. Hendrigan*, 888 F.2d 189, 191–92 (1st Cir.1989).

The record shows the following undisputed facts. Plaintiffs, the Inhabitants of the Cities of Biddeford and Saco, agreed to form the Biddeford–Saco Waste Advisory Committee (the Committee), also a Plaintiff, in order to develop a solid waste disposal facility for the communities. In September 1982 the cities requested proposals for the design, construction and operation of such a facility to incinerate approximately 500 tons of solid waste per week. The facility was to include boilers for the production of steam "to be utilized for cogeneration of electricity and for industrial processing." Request for Proposals (RFP), at 1. The request for proposals was sent to a number of potential bidders, including Defendant KTI. The RFP is a highly detailed document. The procurement schedule provided that in week six, "Preferred Proposer(s) (two)" would be selected "for negotiations." GE's Memo in Support of Summary Judgment Motion, Ex. B(1). The RFP indicates in several other places that negotiations would occur after receipt of proposals. Appendix A to the RFP provides that the proposal bond would be forfeited if the proposer "fails to enter into good faith negotiations with the municipalities to finalize all contract documents." *Id.*

In December 1982, Defendant KTI, as general partner in a consortium of companies, submitted proposal documents in response to the request for proposal. The partnership, Maine Energy Recovery Company (MERC), proposed to design, construct and operate a waste-to-energy plant in the city of Saco. In describing the plant in the proposal, KTI referred to Defendant General Electric Co. as the general contractor, architect, and engineer of the project. *Id.*, Ex. C. The proposal also stated that GE would guarantee the quality and production of the equipment and the plant as an entirety to MERC. *Id.* In its Summary of Economic Analysis, submitted as part of the proposal, KTI referred to itself as the general partner of MERC "with participation by the General Electric Company as contractor/guarantor." *Id.* The document went on to describe GE as one of eight participants in the project. GE was again described as engineer, architect and general contractor, accepting responsibility for plant completion and performance, guaranteeing the power generation capacity of the plant and contracting for furnishing plant maintenance services. *Id.* GE also was to "participate in plant construction financing in a joint venture formed with Kuhr Technologies, Inc. to be the General Partner in the Partnership established to finance the project." *Id.* The final document submitted by KTI to complete the bid explained the idea of forming a consortium of companies of which KTI is the participant becoming completely responsible for the financing, design, construction, testing and operation of a waste-to-energy system. Amended Complaint, Ex. B. The document went on to say that "[t]he relationship established with General Electric Company enables the consortium to assign primary responsibility for the design, construction and testing of these projects to GE as well as for the plant maintenance obligations of the operating plant." *Id.*

At the same time that KTI submitted its proposal in response to the RFP, GE submitted a document entitled "Presentation of Qualifications to Provide Engineer/Design/Construct Services to Saco and Biddeford Maine." Amended Complaint, Ex. A. The cover letter accompanying that document stated: "We are proposing a joint venture of the General Electric Co.'s Projects Engineering Operation (PEO) and

Kuhr Technologies, Inc. of Long Island, N.Y., together with Shawmut Engineering, Inc." *Id.* The letter referred numerous times to the "joint venture," explaining that "[t]he parties in the joint venture have a depth of experience in the referenced technology, and have on-line facilities both domestically and overseas." *Id.* In its answer KTI has admitted that GE proposed a joint venture. KTI's Answer to Amended Complaint, ¶ 27.

On July 19, 1983, the MERC limited partnership was formed. MERC's general partner is KTI, and GE is not a partner. GE's Statement of Material Facts, ¶ 10. On December 7, 1983, Plaintiffs entered into a contract with MERC. GE's Memorandum in Support of Summary Judgment Motion, Ex. D, at 8. Under the contract, MERC was to design, construct, operate and maintain a waste-to-energy facility in accordance with specifications set forth in Appendix A to that contract. *Id.* at 12, 13. The contract provides that it shall not be assigned or delegated by any party without the prior written consent of the others. *Id.* at 29. It further provides that MERC shall not delegate its obligations under this Agreement without written consent of the Committee and the written agreement of the delegate to assume MERC's obligations under the agreement. *Id.* Article XXXII of the contract is an integration clause. *Id.* at 33. Although throughout 1983 representatives of KTI and GE had met with representatives of Plaintiffs to discuss the proposed project, GE had not participated in the negotiations for the December 7 contract. GE was not a signatory to the contract, nor was it mentioned in the contract.

On July 22, 1983, before the execution of the contract between MERC and Plaintiffs, *GE and KTI* entered into a contract, referred to as the Phase I Contract, which recites that Buyer (KTI) wishes to make a proposal to Plaintiffs for the design, construction and financing of a waste-to-energy facility to be owned and operated by MERC. Under the Phase I contract GE is to provide to KTI a preliminary design and project planning for construction of the facility. *Id.*, Ex. A(1). Plaintiffs were not a party to the Phase I contract, which contains an integration clause.

The Phase I contract contemplated that if the work under it were approved by KTI and KTI decided to proceed, there would be a second contract for design, construction and startup of the facility, as well as operator training. *Id.* This Design and Construction contract, referred to as the D & C contract, was executed by *MERC and General Electric* on October 19, 1984. *Id.*, Ex. A(2). Again Plaintiffs were not a party to the agreement. In paragraph 33 the D & C contract contains an integration clause. That paragraph also provides that the contract is solely for the benefit of the parties to it and that it does not confer any rights or benefits on any third party not a signatory.

On June 1, 1985, *MERC and GE* entered into an Operation and Maintenance [O & M] Agreement for the facility, under which GE would effect the startup of the facility and then operate it and maintain it. *Id.*, Ex. A(3). As with the Phase I and D & C agreements, Plaintiffs were not a party to this agreement, and like the D & C agreement, the O & M Agreement contained an integration clause and a clause making clear that the contract had no third party beneficiaries. *Id.* at ¶¶ 17.05 and 17.07. All of the contracts except the Phase I contract specify that Maine law shall govern their construction.

## COUNT VII

In Count VII Plaintiffs allege that GE entered into a contract with Plaintiffs by responding as it did to the RFP and by agreeing with and consenting to the submissions and representations of Defendant KTI regarding the project. Plaintiffs seek relief for GE's failure to meet the requirements set forth in the RFP. The scenario suggested by Plaintiffs is that they accepted a joint proposal forming a contract. The joint aspect of this proposal is crucial because the record makes clear that GE did not submit its own proposal and did not post its own proposal bond as required by the RFP. Defendant argues that it is enti-

tled to summary judgment because no contract was ever formed which can serve as the predicate for this claimed breach.

Plaintiffs argue that a contract arose from Plaintiffs' acceptance of the bid submitted jointly by KTI and GE in December 1982. Plaintiffs cite a number of treatises and cases from other jurisdictions for the proposition that in the field of public contracts, submission of a bid in response to a request for proposals constitutes an offer which becomes a binding contract upon acceptance by the proper public authorities. *See, e.g.*, 64 Am.Jur.2d *Public Works and Contracts* § 63, at 917 (1972); *North American Iron & Steel Co. v. United States*, 130 F.Supp. 723, 724 (E.D.N.Y.1955). The Court rejects application of that proposition under Maine law in the circumstances presented by the record now before it.

First, the Court notes that Plaintiffs have not alleged in the complaint that they accepted the purported joint offer made in the bid. In affidavits submitted by Plaintiffs, however, there are references to the Kuhr GE proposal having been recommended and accepted by the Committee and the Cities. *See* Affidavits of Richard Potvin and Marc Wolman. One exhibit submitted with the affidavit of Donald Simard, City Planner for the City of Biddeford, is a Biddeford City Council Order authorizing city officials to "enter into negotiations with Kuhr General Electric to design, construct and operate a proposed incinerator." Simard Affidavit, Ex. 2. Similarly, a letter from the Southern Maine Regional Planning Commission, whose source of knowledge is not made known, states that "Biddeford and Saco City Councils have formally selected the proposal of Kuhr Technologies, Incorporated/General Electric Company as the best plan for waste disposal and have voted to enter negotiations with Kuhr/GE for the construction of a resource recovery facility.

Even if Plaintiffs selected a proposal made by Kuhr/GE, this fact does not mean that Plaintiffs accepted an offer, making the RFP and the proposal into a binding contract with GE. The RFP, the order of the Council, and the Southern Maine Regional Planning Commission letter, all demonstrate unambiguously that Plaintiffs expected to negotiate with the winning proposer or Kuhr/GE on the specifics of the proposal and to reach a contract at the completion of the negotiations. The RFP states that "the Municipalities are soliciting Proposals in good faith with the intention of signing a contract." The record does not show that Plaintiffs ever negotiated or signed a contract with GE. Rather the documents presented show that KTI negotiated with Plaintiffs and that GE merely was aware of those negotiations.

More important, however, is the fact that the contract reached as the culmination of the expected negotiations is a fully integrated document which contains no ambiguity whatsoever about the parties to it and its terms. The December 7, 1983 contract, like the RFP and the proposal, is for the design, construction, and operation of a waste-to-energy facility. The contract recites that the Agreement is entered into by the Biddeford–Saco Solid Waste Committee, the Cities of Biddeford and Saco, and the Maine Energy Recovery Company and that the Committee, through a competitive selection process, has selected *Maine Energy Recovery Company* as the business entity best qualified to provide the services described in the Agreement. The contract describes MERC as a limited partnership formed on July 19, 1983. General Electric is not shown to be a partner in MERC. The December 1983 contract was executed for MERC by KTI, its general partner, and by Plaintiffs. General Electric was not a signatory, nor was it named anywhere in the document as a party.[2]

Article XXXII of the contract provides:

Both the D & C and O & M contracts have specific paragraphs describing GE's role as that of an independent contractor. D & C Contract, ¶ 27; O & M Contract, ¶ 17.02. The D & C contract makes explicit that "[n]othing contained in this Contract shall create a contractual

---

2. Although the December 7 contract unambiguously speaks for itself, the Court notes that the separate contracts between MERC and GE further reinforce the conclusion that the absence of GE as a party to the December 1983 agreement between Plaintiffs and MERC was intentional.

This instrument (including all appendices and attachments hereto) embodies the whole Agreement of the parties. There are no promises, terms, conditions, or obligations other than those contained herein. This Agreement shall supersede all previous communications, representations, or agreements, either oral or written, between the parties hereto.

Thus, even if the RFP, proposal and its alleged acceptance might have been construed as an agreement between KTI, GE and Plaintiffs for the design, construction, and maintenance of the waste-to-energy project, that agreement is superseded by the December 7, 1983 contract. As the Maine Law Court explained in *Portland Valve, Inc. v. Rockwood Systems Corp.*, 460 A.2d 1383, 1388 n. 5 (Me.1983), an integration clause puts to rest arguments that prior agreements indicate the parties intended to create different obligations than those expressed in the integrated contract.[3] "Where, as here, in the final written contract the parties have expressly agreed that the contract fully integrates their understandings, the contract must be construed independently of extrinsic evidence of any previously existing parole understanding not integrated into the writing." *Id.* The Court may not, therefore, look to other agreements or understandings to determine who the parties are to the contract for design, construction, operation and maintenance of the subject waste-to-energy facility. As discussed above, the December 7, 1983 contract is the contract for the waste-to-energy facility

needed by Plaintiffs and proposed by KTI, and it is unambiguous about the parties obligated under it. There cannot be another implied contract between Plaintiffs and KTI and GE for the same construction project. Since there is no genuine issue of material fact as to formation of a contract based on the RFP, Defendant GE is entitled to summary judgment on Count VII.

## COUNT VIII

■ In Count VIII Plaintiffs allege that Defendants GE and KTI represented themselves as a joint venture and that the conduct and representation by GE, upon which Plaintiffs relied, created a contract between Plaintiffs and GE. Plaintiffs seek relief for breach of the alleged contract for GE's failure to comply with the contractual provisions of the RFP and the December 7, 1983 agreement. GE argues that the RFP created no obligations which could be breached by it, that no joint venture was ever formed, and that the December 7, 1983 contract cannot obligate GE on a joint venture theory because it explicitly obligates only MERC.

Under Maine law,

a joint venture is an association between two or more individuals or entities who agree to pool their efforts and resources to jointly seek profits.... Such a contract may be express or implied, and the finder of fact must consider the conduct of the parties and the surrounding circumstances before reaching a conclusion as to their intent.... [A] writing is not

---

relationship ... between Contractor [GE] and the Municipalities of Saco or Biddeford." D & C Contract, ¶ 27.

**3.** The Court understands, of course, that it must examine all the previous documents, statements and dealings in addition to the final contract to determine if there is a total integration in the purportedly integrated document. *Interstate Industrial Uniform Rental Service, Inc., v. F.R. LePage Bakery, Inc.*, 413 A.2d 516, 519 (Me. 1980). The existence of an integration clause is not determinative, but it is strong evidence of integration. *Id.* Here, in addition to the integration clause, the evidence clearly indicates that the December 7 contract was intended by the parties to be a total integration. As discussed in the text, negotiations on the project

were anticipated after the proposal had been submitted and accepted. Moreover, the December 7 contract appears to deal with all the issues that would be necessary for a complete agreement. While the RFP and proposal provided more design specifics, which might in certain circumstances be considered terms of an agreement, the December 7 contract contains a section entitled "Facility Design and Construction Considerations" which specifically provides that MERC "shall design and construct the Facility in accordance with the outline specifications set forth on Appendix A hereto...." The paragraph goes on to say that MERC shall design the Facility to meet equipment requirements based on information about delivery equipment that would be provided later by Plaintiffs.

indispensable to the creation of a joint venture.

*Nancy W. Bayley, Inc. v. Maine Employment Security Commission*, 472 A.2d 1374, 1377 (Me.1984). An older Maine case, relied upon by both parties made clear that the basic elements of a joint venture are community of interest *and* participation in the benefits or profits. *Simpson v. Richmond Worsted Spinning Co.*, 128 Me. 22, 30 (1929).

In this case it is clear that no joint venture existed between GE and KTI. Although GE referred to a joint venture in its transmission of material to Plaintiffs in conjunction with the KTI proposal, the mere characterization of the relationship by a lay person does not create the legal relationship. The elements of a joint venture must be met. In the actual contract documents spelling out the relationship between GE and MERC[4], GE is referred to as an independent contractor. Moreover, the contracts show unambiguously that GE's work for MERC/KTI was all performed under fixed price contracts. There was, therefore, no agreement to share of profits. Although the O & M contract provides for a bonus for increased production of electricity, that incentive bonus is not tied to MERC's profits, it is tied to waste processed and electricity produced. *See* O & M Contract ¶¶ 4.02(a)(i)(B) and (ii)(A). For example, the bonus for electricity production quite simply provides a varying amount of extra money depending on the level of megawatt hours produced. The amount is not variable dependent on MERC's profits and if MERC should experience a loss there is no decrease in the bonus to GE. The integrated contract documents which supersede any prior agreements make clear that the relationship between KTI and GE for the building of the MERC facility was not one of joint venturers.[5]

Citing *Williston on Contracts*, Plaintiffs set forth an estoppel theory, asserting that GE is estopped to deny its liability on the contracts allegedly breached. Williston states:

> While, as between the parties themselves, a contract is essential for the creation of a joint venture, this is not necessarily so as to third persons. Although the parties may never have intended to become joint venturers, yet, under certain circumstances, they may be held estopped to deny their participation in a joint venture. Even though the parties never intended to join in a common venture, if they actually intended to do the things which taken together would constitute a joint venture, they will be held as joint venturers in so far as third parties may be concerned, regardless of their desire to avoid personal liability.

W. Jaeger, *Williston on Contracts*, § 318A at 563. The documents in this case make it clear that GE and KTI did not intend to share profits or benefits of the project. Since they did not "intend[ ] to do the things which taken together would constitute a joint venture," they cannot be held to be joint venturers as to third parties.

■ Plaintiffs further allege that they relied on the representations of GE and KTI that they were joint venturers and would *not* have entered the contract with MERC if they had known that KTI was not also agreeing to its terms on behalf of GE. Plaintiffs assert a theory of joint venture estoppel based on a California case which states that "[o]ne who consents to being

---

**4.** The records shows that MERC is a limited partnership, the purpose of which is "to design, construct, finance, operate and maintain one or more municipal or other governmental waste to energy plants in Maine." The partnership is composed of KTI as general partner, and only one limited partner, Nicholas Mennona, Jr., a principal of KTI. GE is not included in the limited partnership.

**5.** Plaintiffs argue that the Official Statement raises a question of fact as to whether the bo-

nuses are actually profits in another guise. The D & C and O & M contracts are unambiguous on the nature of the bonuses. Even if they were not, however, the Official Statement would not raise a genuine issue of material fact. Although the Official Statement explains that MERC will generate much of its revenue from sales of electricity, it does not indicate that MERC's revenues are graduated, depending on output, as are GE's under the bonus system.

represented by another as a joint adventurer may be estopped to deny that he is a joint adventurer as to third persons who enter into a transaction in reliance upon an ostensible agency...." *Rivett v. Nelson,* 158 Cal.App.2d 268, 322 P.2d 515, 520 (1958). Plaintiffs argue that the joint venture estoppel theory is a variant of the doctrine of apparent authority, which has been applied here in Maine. *See Twin Island Development Corp. v. Winchester,* 512 A.2d 319 (Me.1986).

In this case an important bar to the imposition of an estoppel or to the application of a doctrine of apparent authority is the fact that Plaintiffs cannot have reasonably relied on any representations of the project as a joint venture. Both the California court in *Rivett* and the Restatement (Second) of Agency, relied on by the Maine Law Court, make plain that reliance on a purported agency must be reasonable. *Rivett v. Nelson,* 322 P.2d 515 (referring to plaintiffs reasonably believing and plaintiffs being warranted in believing); Restatement (Second) of Agency, § 8, Comment c ("Apparent authority exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized."). KTI's proposal, the letter of GE accompanying the proposal, and other words of KTI and GE might, possibly, in the initial phases of dealings with Plaintiffs have given rise to a belief that they were joint venturers who would be partners in the project. After negotiations with KTI, however, Plaintiffs entered into a formal contract for the design, construction, and operation of the facility, which named MERC as the other party and explicitly described MERC as a specific limited partnership. That limited partnership included KTI, not KTI and GE, and another party that was not GE. Common sense dictates that since the December 1983 agreement represented the final integrated agreement of the parties, superseding all other oral and written representations, Plaintiffs, if they thought they were dealing with GE, would have drafted the contract to make certain that GE was a party. *See Pinnacle Community Ass'n, Inc. v. Orenstein,* 872 F.2d 1536, 1542 (11th Cir.1989). By no stretch of commercial reasonableness could Plaintiffs have relied on representations characterizing GE's relationship with KTI as a joint venture as a basis for thinking it was entering into an agreement with both MERC and GE, when the documents regarding the transaction clearly set forth a legal relationship to the contrary. No genuine issue of fact is created as to that conclusion by this record. Summary judgment for GE is, therefore, appropriate on this count.

## COUNT IX

■ Plaintiffs claim in Count IX that they are intended beneficiaries of the Phase I, D & C and O & M contracts between MERC and GE and that GE breached those contracts. The Maine Law Court has said that

> [i]n the proper circumstances we recognize that a third person may sue on a contract to which that person was not a party. *Forbes v. Wells Beach Casino, Inc.,* 307 A.2d 210 (Me.1973). In order for the beneficiary to enforce the contract, however, the promisee must intend that the beneficiary receive the benefit of the promised performance. *Restatement (Second) of Contracts* § 302(1)(b) (1981).

*Martin v. Scott Paper Co.,* 511 A.2d 1048, 1049–50 (Me.1986). Section 302 of the Restatement, adopted by Maine's Law Court, provides:

> (1) *Unless otherwise agreed between promisor and promisee,* a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>
> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
>
> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

Restatement (Second) of Contracts, § 302 (emphasis added).

The O & M and D & C contracts quite plainly demonstrate that the promisor and promisee, GE and MERC, have "otherwise agreed." In those contracts, GE and MERC specifically and unambiguously agreed to exclude the possibility of third-party beneficiaries. The O & M contract provides in paragraph 17.07: "This Agreement is intended to be solely for the benefit of the Owner [MERC] and the Operator [GE] and their successors and permitted assigns and is not intended to and shall not confer any rights or benefits on any third party not a signatory hereof." The D & C contract contains virtually identical language in paragraph 33.[6] Since MERC and GE unambiguously agreed that there would not be third-party beneficiaries to their contracts, the Restatement requires that the Court not undertake to find another contrary intent. *See* Restatement (Second) of Contracts, § 302(1). GE is, therefore, entitled to summary judgment on Count IX.

### COUNT X

■ In Count X Plaintiffs seek recovery for damages allegedly caused by their reliance on negligent misrepresentations made by GE. After careful consideration of the record before it and of Plaintiffs' requests for discovery pursuant to Federal Rule of Civil Procedure 56(f), the Court has concluded that there may be genuine issues of material fact surrounding many of the arguments made concerning the negligent misrepresentation claim. Summary judgment for GE is not appropriate on this count.

### COUNT XI

■ In Count XI Plaintiffs seek recovery for alleged negligence and professional malpractice by GE. GE seeks dismissal on the grounds that Plaintiffs have alleged only economic injury and therefore cannot

bring a tort action. This Court has often reiterated the standard of review on a motion to dismiss:

"A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46 [78 S.Ct. 99, 102, 2 L.Ed.2d 80] (1957). The Court is directed to accept as true all of the plaintiff's allegations and interpret all the facts contained in the complaint most favorably to the plaintiff.

*City Cab Co. v. Edwards*, 745 F.Supp. 757, 759 (D.Me.1990).

In paragraph 159 of Count XI, Plaintiffs allege that GE "knew, and it was reasonably foreseeable, that its failure to perform its design, construction and operational obligations in a reasonably competent manner would result in contractual, special and consequential damages to Plaintiffs." In paragraph 77, Plaintiffs allege that "there have been substantial and ongoing problems relating to excessive noise, odor, and ash particulate emissions from the facility that irritated and/or annoyed the surrounding communities of Saco and Biddeford." Other paragraphs in the complaint allege violation of environmental regulations caused by GE's operation of the plant and an increase in the tipping fees for the towns' solid waste. Complaint, ¶¶ 79, 87–91.

Plaintiffs argue that they have generally alleged property damage to municipal property, explaining "it stands to reason ... that an ash-belching, air, water and noise polluting facility would cause property damage." The Court cannot agree that the complaint, which is cast more in the form of an action for nuisance than negligence, adequately alleges physical or property damage. While it might be possible to prove "irritation" by showing physical harm to persons, it is unclear how Plain-

---

**6.** To the extent Plaintiffs argue that they were intended beneficiaries of the D & C and O & M contracts because the Phase I contract did not exclude third-party beneficiaries, the Court rejects the argument. The Phase I contract was for preliminary design and planning of the project, and Plaintiffs have not alleged breach of that contract. The Phase I contract was also incorporated into the D & C contract which did specifically exclude third-party beneficiaries.

tiffs could seek relief for physical harm to either their citizens or their employees. There is no allegation of property damage from the particulate emissions, just irritation and annoyance, which even in their broadest sense do not encompass such damage.[7]

The Court, then, must determine whether the rule relied upon by Defendants is applicable in Maine. Not only GE, but Plaintiffs as well, acknowledge that "[g]enerally speaking, there is no general duty to exercise reasonable care to avoid intangible economic loss or losses to others that do not arise from tangible physical harm to persons and tangible things." *Prosser and Keeton on Torts*, § 92, at 657 (5th ed. 1984). The Maine Law Court has not specifically addressed the issue. Plaintiffs argue, however, that this case falls within an exception to the general rule under which recovery may be had for pecuniary loss arising from negligent misrepresentations. This count, of course, does not deal with negligent misrepresentations, although Plaintiffs seem to forget that fact from time to time. Plaintiffs assert, correctly, that the exception which they proffer as governing this case has been applied to both negligent representation and negligent rendering of services cases. The broader question is, then, whether Maine would allow recovery for economic loss in a

case such as the one here presented. The Court concludes that it would.

In the past few years Maine has shown a willingness to extend tort liability beyond limits it had previously set that are similar to the general rule of no recovery in negligence for purely economic loss. For example, until 1986 Maine law required proof of physical impact, objective physical manifestation, an underlying or accompanying tort or special circumstances before permitting recovery for negligent infliction of emotional distress. This proof was deemed necessary to ensure that a claim for emotional distress without physical injury was not spurious. In 1986, in *Rowe v. Bennett*, 514 A.2d 802, 817 (Me.1986) the Court decided that, under the circumstances presented, no underlying tort was necessary for such recovery. The following year, in *Gammon v. Osteopathic Hospital*, 534 A.2d 1282, 1283 (Me.1987), the Court disavowed the other prerequisites, explaining that the risk of spurious claims could adequately be limited through application of the usual requirement of foreseeability in torts. Significant for predicting how the Law Court might address similar related issues was its explanation in *Gammon* of its prior decisions on negligently inflicted emotional distress:

They ... demonstrate the frailty of supposed lines of demarcation when they are subjected to judicial scrutiny in the context of varying fact patterns. Moreover,

---

**7.** Plaintiffs, with a rather vague *"See"* cite, have referred to the affidavits of Guy Ferrell and Mark Johnston to support their explanation that "it stands to reason" that property damage would be caused by the facility's failings. Even if the Court were to treat the motion as one for summary judgment because Plaintiffs have submitted material outside the pleadings for consideration, *see* Fed.R.Civ.P. 12(b), Plaintiffs could not prevail on this point.

When presenting its evidence on a motion for summary judgment, the nonmoving party must come forward with specific, provable facts demonstrating that there is a triable issue. As the Supreme court has said: "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249–50, 106 S.Ct. at 2511.

The evidence supporting Plaintiffs' possible physical damage claim is found in the Ferrell and Johnston affidavits. Ferrell avers that "there have been hundreds and hundreds of complaints from residents and municipal officials regarding unpleasant odors, unpleasant noise, and ash particulate emissions coming from the MERC facility." Johnston's affidavit recites that

there have been constant noise, odor, and air particulate emission problems associated with the operation ... of the MERC facility. There were ash fallouts upon neighboring properties, adversely [sic] effecting [sic] private citizens as well as the municipalities. Noise and odor problems also adversely effected [sic] both private citizens and the municipalities.

This evidence is "merely colorable" evidence of physical or property damage, and if presented at trial, it would not be sufficient to forestall a directed verdict against Plaintiffs on their negligence claim, if physical or property damage is required.

these cases disclose our awareness of the extensive criticism aimed at the artificial devices used by courts to protect against fraudulent claims and against undue burden on the conduct of defendants.

*Id.* at 1285.

While the Law Court at one point might have adopted the general rule barring recovery in negligence for purely economic loss, it seems clear that now it is more leery of such "artificial devices." If it were to consider the claim for damages for economic loss in the context of the negligence claim and specific fact pattern presented here, it would likely survive. Certainly, the economic loss to Plaintiffs was highly foreseeable and the possibility of widespread economic loss to other Plaintiffs is unlikely.

The Court notes that the Law Court affirmed the award of damages for some elements of purely economic loss caused by the negligence of a professional architectural association, while refusing to permit the recovery of other elements of such loss. *Wendward Corp. v. Group Design, Inc.,* 428 A.2d 57, 59–60 (Me.1981). In *Wendward,* the Plaintiffs sought more "benefit of the bargain" damages than had been awarded by the referee, arguing that such damages are allowed in negligent misrepresentation and attorney malpractice cases. *Id.* at 60. The Law Court did not reject Plaintiffs' argument on the grounds that such damages were not available in a negligence case, but rather because in that case Plaintiffs had not proved that the damages were caused by Defendants' negligence. *Id.* Also without much comment, the Law Court has recently allowed recovery for purely economic loss in a suit brought against an insurance company for negligent failure to file documents and for negligent misrepresentation. *Lindsey v. Mitchell,* 544 A.2d 1298 (Me.1988). Other jurisdictions have also allowed such claims. *See, e.g., Doran–Maine, Inc. v. American Engineering & Testing,* 608 F.Supp. 609, 615 (D.Me.1985) (applying Massachusetts

law); *J'Aire Corp. v. Gregory,* 24 Cal.3d 799, 157 Cal.Rptr. 407, 598 P.2d 60 (1979); *Waldor Pump and Equipment Co. v. Orr–Schelen–Mayeron & Associates, Inc.,* 386 N.W.2d 375 (Minn.App.1986). Given the Law Court's current tort jurisprudence, the Court finds that Maine law would not preclude recovery in a negligence action like this one merely because the relief sought is for purely economic loss. The Court finds, therefore, that GE's motion to dismiss Count XI must be denied.

## COUNT XII

Count XII alleges that by breaching its contracts for the design, furnishing, installation and operation of the MERC Facility, GE breached express warranties made by it in its proposal, in its representations and testimony to Plaintiffs and State environmental officials, and in its contractual agreements with Defendant KTI and MERC. Defendants have moved to dismiss the Count because it fails to state a claim upon which relief can be granted. They assert that no warranty theory is available because Plaintiffs' claims are merely a recasting of their misrepresentation and third-party beneficiary claims that have now been rejected by this Court.

Plaintiffs base their claim on section 2–318 of Maine's version of the Uniform Commercial Code, which provides that lack of privity between the plaintiff and defendant is no defense in any action brought against the manufacturer, seller, or supplier of goods for breach of warranty. 11 M.R.S.A. § 2–318. Since the U.C.C. does not govern this transaction, Plaintiffs' warranty claim must be dismissed.[8]

Section 2–102 makes the Code's provisions applicable only to the sales of goods. Goods are defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale...." 11 M.R.S.A. § 2–105. "When as here the transaction involves provision of both goods and services, the question for application of the UCC

---

**8.** The Court need not discuss, therefore, whether all of the alleged representations constitute express warranties.

becomes whether as a factual matter the transaction predominantly relates to goods." *Lucien Bourque, Inc. v. Cronkite,* 557 A.2d 193, 195 (Me.1989). The transaction, of course, is described by the contract. Although the question of the applicability of the U.C.C. is usually one of fact, if the contract, the operative "fact" is unambiguous, the Court may decide the issue as a matter of law. *United States v. Twin Falls, Idaho,* 806 F.2d 862, 870 (9th Cir.1986).[9]

The contract here shows unambiguously that services predominate over the sale of materials. It recites that it covers Phase II of a project to design, equip, construct, and start up a waste-to-energy facility. D & C Contract at 1. Clearly, the recital makes the contract sound like a contract primarily for services. The Phase I contract, which was incorporated into the D & C Contract, makes it even more explicit. It recites that that contract is for the furnishing of services in Phase I of the project, and "to establish the conditions on which Contractor [GE] will propose to furnish *services* under Phase II if Buyer decides to proceed with Phase II." Phase I Contract, at 2 (emphasis added). The work scope of the contract is provided in ¶ 2: "The Work consists of (i) preparation of Final Design Deliverables, (ii) Equipment procurement, (iii) construction of the total Facility, (iv) supervision of start-up, and performance testing of the Facility, and (v) orientation of Buyer's personnel in operation of the Facility...." Clearly, services are the predominant factor in this listing. Moreover, the contract was for a fixed fee of $63,116,000, without any allocation of price breakdown between engineering or other services and material costs. *See Bourque,* 557 A.2d at 195. The whole plant is not a movable good, so if the contract were predominantly for the sale of part of the physical equi-

page of the plant as "goods", the expectation would be that those goods would be listed with their prices. The contract, as titled, is clearly a design and construction agreement and the furnishing of the materials is incidental to the performance of those services. *See, De Matteo v. White,* 233 Pa.Super. 339, 336 A.2d 355 (1975). This Court, addressing an almost identical question in *Lincoln Pulp & Paper Co., Inc. v. Dravo Corp.,* 436 F.Supp. 262, 275 (D.Me.1977), stated: "The contract is a typical engineering-construction contract involving predominantly the rendition of services, not the sale of goods. As such, it falls outside the scope of Article 2." Summary judgment for GE is, therefore, appropriate on Count XII.

## COUNT XIII

Count XIII alleges a claim based on strict products liability. The law governing the claim is 14 M.R.S.A. § 221 which imposes liability on sellers of "goods or products in a defective condition unreasonably dangerous to the user or consumer or to his property ... for physical harm thereby caused to a person ... or to his property." Defendant argues that the claim must be dismissed because it does not allege any facts indicating personal injury or property damages. Plaintiffs argue that for purposes of a motion to dismiss, they have adequately alleged physical harm. The Court has specifically rejected that argument above in discussion of the negligence count. *See supra* at 194–195. Count XIII must, therefore, be dismissed.

## COUNT XIV

Count XIV is entitled "Fraudulent Misrepresentation." It alleges that in their cross-claim against GE, MERC and KTI have alleged various fraudulent mis-

---

**9.** Plaintiffs have suggested that this issue may not be resolved on a motion to dismiss for failure to state a claim because there must be a fact determination. That is obviously not entirely correct. Here the governing, unambiguous contracts were submitted not with the complaint, but with the materials submitted on Defendants' motion for summary judgment. Under Fed.R.Civ.P. 12(b) the Court, therefore, treats the motion as one for summary judgment. Rule 12(b) requires the Court to give the party opposing such a converted motion an opportunity to submit all materials made pertinent to such a motion. Here, because the contracts, already in the record, are unambiguous, no other materials are pertinent to this issue, and there is no need to allow the presentation of other material.

**198**

representations by GE. Based solely on MERC's and KTI's allegations in the cross-claim, Plaintiffs here allege:

> In that the inability of Defendants MERC and KTI to comply with their contractual obligations to Plaintiffs are [*sic*] due in whole or in substantial part to the fraudulent misrepresentations of General Electric as alleged by KTI and MERC set forth above, Plaintiffs have been damaged and will continue to suffer damages as herein alleged from said fraudulent misrepresentations.

Amended Complaint, ¶ 174.

Defendants argue in their motion that the complaint does not make out a claim for fraudulent misrepresentation. Plaintiffs appear to agree, because rather than defending that claim, they argue that Count XIV states a claim for interference with contractual relations based on fraud. GE counters in its reply brief that Plaintiffs cannot prevail on the latter theory because the words intentional interference with contractual relations do not appear in the complaint. That argument is incorrect, however. The Court should not dismiss a complaint if the facts pled support any possible theory of relief. *See Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir.1988).

Maine has long recognized the intentional tort of interference with an economic relationship which is described as follows: " '[W]herever a person, by means of fraud or intimidation, procures, either the breach of a contract or the discharge of a plaintiff, from an employment, which but for such wrongful interference would have continued.' " *MacKerron v. Madura*, 445 A.2d 680, 683 (Me.1982) (*quoting Perkins v. Pendleton*, 90 Me. 166, 176, 38 A. 96 (1897)). The question is, then, whether the complaint sets forth this cause of action.

Examination of the allegations in this count shows that Plaintiffs have pled no facts that would support a claim of intentional interference. Rather they have alleged repeatedly that MERC and KTI have made certain allegations concerning GE in their cross-claim. The Court reviewing a complaint for its sufficiency must look to alleged *facts*, not alleged *allegations*. *See Gooley v. Mobil Oil Corp.*, 851 F.2d at 514 ("the court 'must accept the *well-pleaded factual averments* of the latest … complaint as true and construe these *facts* in the light most flattering to the [plaintiff's] cause.' "); *see also*, 5A C. Wright and A. Miller, *Federal Practice and Procedure* § 1357, at 312 (2d.1990). Here, if the Court were to accept as true all that Plaintiffs have alleged, the only true fact would be that the other Defendants have alleged certain misrepresentations in their cross-claim. Such facts could not support a claim by Plaintiffs for either fraudulent misrepresentation or tortious interference with a contractual relationship. Thus, Count XIV must be dismissed.

### Rule 56(f) Motion

Plaintiffs have argued that they have raised genuine issues of fact to defeat GE's summary judgment motion, but they have made a motion for discovery under Federal Rule of Civil Procedure 56(f) if the Court should find otherwise, as it now has in Counts VII–IX. The record shows that since the time of Plaintiffs' Rule 56(f) affidavit, they have been provided access to the documents produced in connection with the arbitration case between MERC and GE and have been permitted access to those proceedings and to documents produced as exhibits in those proceedings. The record, and particularly GE's submission on its motion to stay pending arbitration, indicates that many of the same issues are being addressed in that arbitration. The Court has not, however, received any new evidentiary submissions from Plaintiffs based on the newly discovered materials.

The Court will address Plaintiffs' requests for discovery in turn. In ¶ 4(a) Plaintiffs seek discovery on GE's and KTI's intent during 1982–83 with respect to a joint venture, the preparation of the proposal, and conferring a benefit on Plaintiffs with the proposal. They also seek to learn GE's and KTI's intent when the contract between MERC and Plaintiffs was made and when the contracts between MERC,

KTI and GE were made. Because there are unambiguous, integrated contracts both showing that the December 7, 1983 contract, and not the RFP and proposal, is the contract for the MERC facility and expressing the relationships between the parties, parol evidence on the issue of the parties' intent at the time of contracting or prior to contracting could not raise a genuine issue of material fact. Similarly, since GE and KTI had unambiguously agreed that there would be no third-party beneficiaries to their contracts, intent of the parties on that issue is immaterial.

In paragraph 4(b) Plaintiffs seek discovery regarding GE's knowledge regarding the terms of the MERC/KTI negotiations and agreements with Plaintiffs in 1983–84. Plaintiffs assert in their memorandum that they intended and GE was aware that whoever designed, built and operated the MERC facility should be bound by the requirements, guarantees and provisions of the RFP and the December 7, 1983 agreement. Again, the December 7 agreement, which does not incorporate the RFP, supersedes "all previous communications, representations or agreements" between Plaintiffs and MERC/KTI. Therefore, what GE knew about the terms of the negotiations is immaterial.

The information requested in paragraphs 4(c) and (d) relates to Plaintiffs' misrepresentation claim, and discovery should go forward before the Court addresses the summary judgment motion on this count.

In paragraph 4(e) Plaintiffs seek to discover the authority given by GE to KTI to make representations on behalf of GE as part of the joint venture team. Even if GE had authorized KTI to make representations on its behalf, they came to naught since the integrated contract that was executed for the MERC project was between only MERC and Plaintiffs and did not include GE. As the Court explained above, there can be no justifiable reliance on any such representations in a commercial context such as this one after the signing of the December 7 contract and the release of the Official Statement.

Paragraphs 4(f), 4(g), 4(h), 4(i), and 4(j) all seek discovery of material about the relationship between KTI and GE, *e.g.*, the corporate relationship between KTI and GE, whether the companies ever agreed to form a joint venture, whether GE ever shared in the profits or management of MERC and whether GE owns any property rights in MERC. Plaintiffs allege in their complaint that KTI and GE were joint venturers in the design, construction and operation of the MERC facility. As described above, the relationships between the parties in this case surrounding the design, construction and operation of the MERC facility were spelled out in integrated, unambiguous contracts. Those agreements, by their terms, supersede any other written or oral agreements, discussions, understandings or representations of the parties on the subjects covered by them. Although a contract for a joint venture need not be in writing, it cannot exist if it has been superseded by the actual integrated contracts dealing with the same subject. Thus, information that might shed light on a purported prior agreement of the parties which has been superseded is immaterial.

Paragraph 4(k) of the motion seeks information on the intent of Defendants underlying the drafting of the 1986–87 principles for "joint venture and participation" between GE and KTI as well as discovery of any earlier documents and negotiations. The Court sees no necessity for this discovery on intent since the 1986–87 documents significantly postdate the alleged formation of the joint venture for the MERC project. Discovery of any prior documents or negotiations would add little given the unambiguous descriptions of the parties and their relationships to one another in the contractual documents controlling the design, construction and operation of the MERC facility.

In Paragraph 4(1) Plaintiffs have also suggested that they need information concerning GE's involvement with and knowledge of the drafting of the contents of the Kidde Consultants' Feasibility Report and Official Statement. Such discovery might bear on Plaintiffs' negligent misrepresentation claim and should therefore be conduct-

ed before the Court addresses the summary judgment motion on Count X.

In broad outline then the Court finds that discovery relating to the misrepresentation claim may raise a genuine issue of material fact and should go forward before GE's motion for summary judgment on that count is decided. The Court cannot find that Plaintiffs' asserted lack of discovery regarding the contract claims would generate genuine issues of material fact on those claims.

Accordingly, it is ORDERED that GE's motion for summary judgment be, and it is hereby, GRANTED on Counts VII, VIII, IX, and XII. GE's motion for summary judgment on Count X is DENIED without prejudice to its reassertion at a later time. It is FURTHER ORDERED that GE's motion to dismiss Counts XIII and XIV be, and it is hereby, GRANTED and that GE's motion to dismiss Count XI be, and it is hereby, DENIED.

SO ORDERED.