**PORTLAND VALVE, INC.**

v.

**ROCKWOOD SYSTEMS CORP. and Gulf & Western Manufacturing Co. (Eastern Group).**

Supreme Judicial Court of Maine.

Argued March 15, 1983.

Decided June 13, 1983.

Kelly, Remmel, & Zimmerman, U. Charles Remmel, II (orally), Leland N. Chisholm, Portland, for plaintiff.

Robinson & Kriger, Robert C. Robinson (orally), Portland, Skadden, Arps, Slate, Meagher & Flom, Henry P. Baer (orally), New York City for Rockwood Systems.

Pierce, Atwood, Scribner, Allen, Smith & Lancaster, John J. O'Leary, Jr. (orally), Ralph Lancaster, Jr., Portland, for Gulf & Western.

Before GODFREY, NICHOLS, ROBERTS, CARTER, VIOLETTE and WATHEN, JJ.

CARTER, Justice.

The plaintiff, Portland Valve, Inc. (PVI), appeals a directed verdict entered in Superior Court, Cumberland County, in favor of one of the defendants, Gulf & Western Manufacturing Co. (GW). Rockwood Systems Corp. (RSC), the other defendant, cross-appeals a judgment entered in favor of PVI. We affirm the judgment rendered in favor of GW. We reverse the judgment entered against RSC.

I. *Procedural and Factual Background*

In 1973, GW manufactured and sold both government proprietary and nonproprietary ball valve parts for use in Navy submarines. GW designed the proprietary ball valve parts for the government; the drawings of these parts were the sole property of GW. The Navy designed and owned the drawings of certain nonproprietary ball valve parts. GW also manufactured and sold aircraft engine components, firefighting equipment, and commercial ball valves.

In June of 1973, GW sold to PVI a dealer franchise to sell the proprietary government ball valve spare parts. GW covenanted that it would "not appoint another Dealer to be primarily responsible for selling the spare parts in the United States so long as Dealer's sales and services performance and organization in the territory continue to be satisfactory." PVI paid GW $5,000 for the franchise, which included the use of the drawings of the proprietary spare parts line.

In October of 1973, GW sold all of its tangible and intangible assets, goodwill and business as a going concern to Universal Valve Corp. for $1.5 million. Universal Valve Corp. then transferred its acquisitions under the contract to RSC, its wholly-owned subsidiary. Although the agreement did not explicitly mention the contract between GW and PVI, the agreement provided that RSC would assume all dealer agreements terminable on thirty days notice. The GW and PVI contract contained such a termination provision.

In 1975, PVI filed a complaint against RSC claiming that by competing with PVI for the government ball valve spare parts market, RSC violated the contract that existed between GW and PVI. PVI subsequently amended the complaint to include claims against GW. Count I alleged that by placing RSC in competition with PVI, GW breached the contract which had established PVI as "a sole and exclusive dealer, agent or franchise to manufacture and sell in the United States" government ball valve spare parts. Count II against GW alleged that by placing RSC in competition with PVI, GW breached the contract which had established PVI as "primary dealer-agent or franchisor."

RSC moved for a summary judgment alleging that the agreement between PVI and GW did not provide any basis for PVI's claims against RSC. The motion was denied with respect to proprietary government ball valve spare parts.[1]

Before trial, GW filed a motion to dismiss Count I of the complaint. In that motion, GW claimed that the franchise agreement did not provide any basis for PVI's allegation that it had been appointed an exclusive dealer. The trial justice denied the motion.

In addition, both defendants, GW and RSC, filed a motion *in limine* arguing that because the contract was unambiguous on its face, parole evidence for the purpose of

---

1. Pursuant to a motion for clarification, the justice who presided over the motion for summary judgment stated: "The issue of whether parole evidence offered to prove the meaning of the term 'primarily responsible' ... may or may not be used for the purpose of showing that the phrase means 'exclusive' was not addressed and not decided...."

establishing that the agreement provided an exclusive right to sell should be excluded. The trial justice also denied that motion.

At trial, after the two negotiators of the agreement, Frank Curtis for PVI and William Clegg for GW, had testified but before the end of the plaintiff's case, the trial justice addressed GW's motion for a directed verdict on Count I. Count I alleged that the contract appointed PVI as an exclusive dealer. PVI objected on the basis that the motion was untimely. In granting the directed verdict, the trial justice reasoned that

> based upon the evidence, both of Mr. Clegg and Mr. Curtis and the document as it has been introduced and accepted into evidence this Court is satisfied that there is not sufficient evidence as a matter of law to present that to the jury to determine whether or not it was an exclusive contract, and this Court as a matter of law would make such a ruling based upon the evidence thus far that it was not an exclusive contract.

Although GW requested a directed verdict on Count II, the motion was reserved for further consideration. The justice also granted a summary judgment in favor of GW on Count I.

After all its evidence had been submitted, PVI asked the court to reconsider the directed verdict and the summary judgment on Count I. The justice did consider the ruling but refused to change his decision. He again directed a verdict for GW on Count I.

GW then made a motion for a directed verdict on Count II. Count II alleged that GW had established RSC as a primary dealer, agent, or franchisee. Granting the motion, the justice reasoned that the contract between GW and RSC was an assignment and not the creation of a dealership.

Also at that time, RSC moved for a directed verdict. The separate complaint against RSC alleged that by competing with PVI, RSC breached the contract that existed between GW and PVI. The justice denied the motion.

At the end of all the evidence, the jury was instructed on a breach of contract theory. After deliberations, the jury returned a one million dollar verdict for PVI against RSC. PVI then moved for entry of a permanent injunction which the justice denied. RSC filed motions for new trial and for judgment notwithstanding the verdict. The justice denied both motions.

PVI subsequently filed a notice of appeal of the ruling on the motion for directed verdict and summary judgment in favor of GW and of the denial of the permanent injunction. RSC filed a notice of a cross-appeal of the one million dollar judgment.

## II. *PVI's Appeal*

 PVI contends that the justice erred in directing a verdict for GW. PVI argues that there is a genuine issue of fact as to whether the agreement granted PVI an exclusive right to sell spare parts and whether GW breached that agreement. An agreement providing an exclusive right to sell prevents GW from selling the spare parts. Under an agreement providing an exclusive agency, GW may not appoint another dealer to sell the spare parts line. *Stahlman v. National Lead Co.,* 318 F.2d 388, 393 (5th Cir.1963); *Dallas Electric Supply Co. v. Branum Co.,* 143 Tex. 366, 370–73, 185 S.W.2d 427, 430–31 (1945).

> [T]he presiding Justice should direct a verdict only sparingly, as the exception rather than the rule. Only if the correctness of directing a verdict appears so clear to the presiding Justice that all reasonable doubts of possible error or uncertainty have been removed in his mind should he grant it.

*Moore v. Fenton,* 289 A.2d 698, 700 n. 1 (Me.1972), *quoted in,* 2 Field, McKusick & Wroth, *Maine Civil Practice* § 50.1 at 313 (2d ed. Supp.1981). In addition to that policy, GW has the heavy burden of establishing that no reasonable view of the evidence, including every justifiable inference most favorable to PVI, could sustain a jury verdict for PVI. *See Emerson v. Ham,* 411 A.2d 687, 689 (Me.1980); *Boetsch v. Rockland Jaycees,* 288 A.2d 102, 104 (Me.1972).

GW first asserts that the interpretation of an unambiguous contract is a question of law for the Court. GW argues that a franchise agreement which provides that GW will not appoint another dealer to be "primarily responsible" for selling spare parts so long as PVI's services remain satisfactory cannot reasonably be interpreted as granting PVI an exclusive right to sell spare parts.

■■■ The issue of whether contract language is ambiguous is a question of law for the Court. *See Eskimo Pie Corp. v. Whitelawn Dairies, Inc.,* 284 F.Supp. 987, 995 (S.D.N.Y.1968); *see also Clayman v. Goodman Properties, Inc.,* 518 F.2d 1026, 1034 (D.C.Cir.1973). The interpretation of an unambiguous written contract is a question of law for the Court; the interpretation of ambiguous language is a question for the factfinder. *Zamore v. Whitten,* 395 A.2d 435, 440 (Me.1978); *T–M Oil Co. v. Pasquale,* 388 A.2d 82, 85 (Me.1978). The interpretation of an unambiguous writing must be determined from the plain meaning of the language used and from the four corners of the instrument without resort to extrinsic evidence. *See City of Augusta v. Quirion,* 436 A.2d 388, 392 (Me.1981); *T–M Oil Co.,* 388 A.2d at 85; *see also Ames v. Hilton,* 70 Me. 36, 43 (1879). Once an ambiguity is found then extrinsic evidence may be admitted and considered to show the intention of the parties. *Palmer v. Nissen,* 256 F.Supp. 497, 503 (D.Me.1966) (quoting *Ames,* 70 Me. at 43); *T–M Oil Co.,* 388 A.2d at 85. Contract language is ambiguous when it is reasonably susceptible of different interpretations. *Lee v. Flintkote Co.,* 593 F.2d 1275, 1282 (D.C.Cir.1979); *accord Barham v. Barham,* 33 Cal.2d 416, 422–424, 202 P.2d 289, 293 (1949); *Martindell v. Lake Shore National Bank,* 15 Ill.2d 272, 282–284, 154 N.E.2d 683, 689 (1958); *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 516–518, 243 S.W.2d 154, 157 (1951); *Young v.*

*Schriner,* 190 Va. 374, 378–379, 57 S.E.2d 33, 35 (1950).

The contract granted PVI a franchise to sell ball valve spare parts in accordance with GW's drawings. GW covenanted that it would not appoint another dealer to be primarily responsible for selling spare parts so long as PVI's performance remained satisfactory. GW also promised to supply PVI with its drawings of the spare parts line.

PVI promised that because the drawings were the exclusive proprietary property of GW, it would retain all copies of the drawings in confidence. PVI covenanted that it understood that the continuance of the agreement depended upon its satisfactory performance and that performance would be considered unsatisfactory if there were recurring complaints from customers.[2]

Under the miscellaneous provisions, PVI agreed to pay GW $5,000 for the use of the drawings and to buy "readily saleable, non-obsolete" inventory. The agreement also contained an integration clause which provided that:

> This agreement constitutes the entire understanding and agreement between Rockwood and Dealer and supercedes and terminates all other prior arrangements, understandings and agreements, verbal or written, between them with respect to the subject matter of this agreement....

Finally, the contract read that GW could terminate the agreement upon thirty days notice to PVI.[3]

■■■ We determine that this contract language is not ambiguous as to the creation in PVI of any exclusive right to sell the spare parts. Under the terms of the contract, it is clear that GW promised *not to appoint another dealer* to be primarily responsible if PVI performed satisfactorily as defined in the contract. It is equally clear that such contract language in no way limited GW's right to sell the parts. That language at most may imply that the con-

---

2. In addition, PVI covenanted that it would act as principal for all sales transactions. PVI also acknowledged its independent contractor status and agreed to maintain a place of business in the United States.

3. The contract also contained a modification clause.

tract created an exclusive agency not an exclusive right to sell.[4] The contract was completely silent as to providing PVI with an exclusive right to sell spare parts. "The plain language of the contract cannot be stretched or tortured to provide meaning sufficient to make [PVI's] theory of interpretation of the language workable." *Quirion,* 436 A.2d at 394; *see also Lee,* 593 F.2d at 1285 (language cannot be strained to connote grant of exclusive agency). In addition, the contract contained an integration clause which read that this agreement "supercedes and terminates" all other prior "arrangements, understandings and agreements" between the parties.[5] The complete lack of any contract language preventing GW from selling spare parts combined with the integration clause necessarily leads to the conclusion that the unambiguous contract language did not create in PVI any exclusive right to sell spare parts.

Moreover, courts should not rewrite contracts, particularly agreements between two corporations acting at arms length. *See Aroostook Valley Railroad Co. v. Bangor & Aroostook Railroad Co.,* 455 A.2d 431, 433 (Me.1983). "We are skeptical, too, that so important a feature [as exclusive selling rights] of the franchise agreement would be so infelicitously phrased by those as astute as businessmen generally are." *Lee,* 593 F.2d at 1282. In the absence of any express language or of any ambiguous language, which would permit the admission of relevant extrinsic evidence, reasonably indicating such a restrictive intent, the court will not lightly import meaning into the contract. *Stahlman,* 318 F.2d at 394; *Dallas Electric Supply Co.,* 143 Tex. at 372–373, 185 S.W.2d at 431; *see also Swinny v. Cities Service Oil Co.,* 197 So.2d 795, 797 (Miss. 1967) (seeking exclusive agency); *Dahath Electric Co. v. Suburban Electric Development Co.,* 332 Pa. 129, 130–134, 2 A.2d 765, 767–68 (1938) (seeking exclusive agency).

We hold that the contract is unambiguous, that extrinsic evidence was not admissible to aid in the interpretation of the contract language, and that the contract did not provide PVI with an exclusive right to sell spare parts.[6] The determination of the

---

**4.** That language does not necessarily create an exclusive agency. That language merely reserves in PVI the right to hold GW to its promise *not to appoint* another dealer to be primarily responsible so long as PVI adequately performed its obligations under the contract. Such a reservation does not necessarily create in PVI any right to be primarily responsible without any additional prior language. *Cf. Hill v. Lord,* 48 Me. 83, 95 (1861) (reservation in public of any right to land does not confer interest in land to the public without additional language). Moreover, even if PVI was given the right to be primarily responsible, that right is not necessarily equivalent to being given the right to be the exclusive dealer.

**5.** This integration clause puts to rest PVI's argument that statements made prior to the execution of the contract indicated that the parties intended to create in PVI an exclusive right to sell.

We note that the case of *Interstate Industrial Uniform Rental Service, Inc. v. F.R. Lepage Bakery,* 413 A.2d 516 (Me.1980), is distinguishable from this case factually in that the contract there involved contained no merger or integration clause and in that the contract was found to be only partially integrated. The case is further distinguishable by the substantive difference between the issue there posed for decision and the one raised in the present case. In *Lepage,* the issue was whether extrinsic evidence of an oral agreement, unexpressed in the written, partially integrated agreement, was barred *as a matter of law* in determining *whether the oral agreement was integrated into the written agreement.* 413 A.2d at 520. Here, the issue posed is whether an express and total integration clause may bar consideration of extrinsic evidence of an oral agreement in determining *whether an ambiguity exists in the express language of the written agreement. See* 413 A.2d at 519 n. 2, 520 & 521.

The combined effects of those substantive differences in the issues and the particular facts of each of the two cases serve to dictate the differing results in the two cases. Where, as here, in the final written contract the parties have expressly agreed that the contract fully integrates their understandings, the contract must be construed independently of extrinsic evidence of any previously existing parole understanding not integrated into the writing. The use of such extrinsic evidence as an aid in construction for that purpose is impermissible.

**6.** We need not determine, therefore, whether the entry of the directed verdict and the summary judgment before the end of the plaintiff's case was untimely.

trial court, even if based upon improper reasoning, will be upheld if it is the correct result. *See Allstate Insurance Co. v. Lyons,* 400 A.2d 349, 352 (Me.1979); *Laferriere v. Paradis,* 293 A.2d 526, 529 (Me.1972). Because our analysis supports the judgment of the Superior Court which was based upon the directed verdict entered in favor of GW, we affirm that judgment.

### III. *RSC's Appeal*

RSC contends that the justice erred in denying its motion for directed verdict or motion for judgment notwithstanding the verdict. The separate complaint against RSC alleged that by competing with PVI for the spare parts market, RSC breached the contract that existed between GW and PVI.

 While directing a verdict in favor of GW on Count II of the complaint, the court ruled that as a matter of law GW assigned the PVI contract to RSC.[7] We agree with the court's conclusion. GW sold its business as a going concern to RSC for $1.5 million. Under that contract, RSC assumed all dealer and franchisee agreements which were terminable upon thirty days notice. The PVI contract is such an agreement. As the assignee, RSC stepped into GW's position as the principal under the PVI contract.

As we discussed earlier, the PVI contract did not prevent GW from selling spare parts. Consequently, the contract does not limit RSC, as the assignee of the PVI contract, from selling the ball valve spare parts. The only limitation that the contract places on RSC's rights under the contract is that RSC cannot appoint another dealer to be primarily responsible for selling spare parts so long as PVI performs satisfactorily. The record is void of any evidence indicating that RSC appointed another dealer. Rather, the complaint and all the evidence at trial indicate that PVI is seeking to recover damages resulting from RSC's sale of the spare parts subject to the contract and to prevent RSC from future sales of such spare parts. Because the contract does not create in PVI an exclusive right to sell, RSC as the assignee of the contract may sell spare parts. We reverse the judgment of the Superior Court which denied RSC a directed verdict and judgment notwithstanding the verdict.

The entry is

As to PVI's appeal, judgment affirmed.

With regard to RSC's appeal, judgment reversed.

All concurring.

---

**7.** In Appellant's Brief at 9–11 n. 4, PVI contends that the justice while addressing Count II, improperly ruled that the contract had been assigned by GW to RSC. PVI argues that by *determining that the contract was assigned,* the court prevented PVI from asserting that it had purchased the spare parts line outright. PVI's claim lacks merit. The contract between GW and PVI clearly states that PVI purchased the *use* of the drawings of the spare parts line and that title to drawings of that line remained in GW. PVI, therefore, could not have purchased the line outright.