April 7, 1993 [NOT FOR PUBLICATION]

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1740

FLEET BANK OF MAINE,

Plaintiff, Appellee,

v.

HARVEY E. PRAWER and GILBERT PRAWER,

Defendants, Counterclaim Plaintiffs, Appellants,

and

FEDERAL DEPOSIT INSURANCE CORPORATION,

Counterclaim Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge]

Before

Breyer, Chief Judge,

Campbell and Bownes, Senior Circuit Judges.

Joseph J. Hahn with whom Bernstein, Shur, Sawyer & Nelson was on

brief for appellants.
Alexandra L. Treadway with whom P. Benjamin Zuckerman and Verrill

& Dana were on brief for appellees.

CAMPBELL, Senior Circuit Judge. Maine Savings Bank

brought this action against appellants, Harvey E. Prawer and

Gilbert Prawer, to collect money owed to it under two

promissory notes the appellants had personally guaranteed.

The bank alleged that Limehouse Corporation ("Limehouse"), of

which Harvey Prawer was the president, defaulted on the notes

when it stopped making monthly interest payments.1

Appellants argued below, as the basis of their affirmative

defenses and their counterclaims against the bank, that

Limehouse stopped making payments because the bank had

reneged on an agreement to provide even more financing for

their real estate project. The United States District Court

for the District of Maine granted summary judgment for the

bank's successors in interest, appellees Fleet Bank of Maine

and the FDIC, and we affirm.

I.

The district court found the following facts to be

undisputed. In 1987 appellants Harvey and Gilbert Prawer, on

behalf of Limehouse, of which Harvey Prawer was president,

began negotiations with Maine Savings Bank ("the Bank") for

the financing of the purchase and development of 122 acres of

1. Limehouse Corporation is not a party to this action.
The bank sued only Harvey E. Prawer and Gilbert Prawer in
their individual capacities, as guarantors of one promissory
note and co-makers of the other.

land in Scarborough, Maine. Appellants planned to subdivide

the property and market it as a planned residential community

known as "Coulthard Farms." At the time of the negotiations,

the total cost of the project was estimated to be $2,500,000,

consisting of $1,000,000 for the purchase of the real estate

and $1,500,000 for the construction of the infrastructure

roads, sewers, water supply and other structures needed to

transform the land into a residential community.

On October 1, 1987, the Bank issued a commitment

letter ("First Commitment Letter"), in which it offered to

lend $1,000,000 to Limehouse for purchase of the Coulthard

Farms property, for a term of "36 months, on demand

thereafter," at an adjustable rate, initially 10.50%. The

Letter specified that interest payments were to be made

monthly. By signing the Letter, Harvey Prawer agreed on

behalf of Limehouse to borrow the money "in accordance with

the [] terms and conditions" of the Letter, including

granting the Bank a mortgage on the property. One paragraph

of the four-page letter of terms and conditions said, "This

loan shall be repaid from the sale of the mortgaged property

or its refinancing into a residential subdivision development

loan."

On October 15, 1987, Harvey Prawer, as president of

Limehouse, executed a promissory note ("First Note") in the

amount of $1,000,000 to the Bank. Both Harvey and Gilbert

-3-

Prawer, acting in their individual capacities, executed an

unconditional guaranty of the First Note. The First Note

obligated Limehouse to make monthly payments of the interest

due and to repay the principal sum on demand after October 1,

1990.2 A default provision defined "default" as including

failure to pay any installment of the interest due and

authorized the holder of the Note, in addition to the right

to demand payment after October 1, 1990, to declare the Note

immediately due and payable in full in the event of a

default.3 The provisions of the First Note, while

2. The First Note provided, in part:

For Value Received, On Demand after
October 1, 1990, the undersigned promises
to pay to the order of Maine Savings
Bank, a Maine banking corporation, the
sum of One Million Dollars
($1,000,000.00), or so much thereof as
may be advanced, together with interest
upon the principal sum thereof from time
to time advanced, . . . ; which interest
at said rates shall be paid monthly in
arrears on the first day of each
succeeding month hereafter, with a final
payment of interest when the indebtedness
evidenced hereby is paid in full.

3. The default provision of the First Note provided:

In case of default in the payment of
any installment of interest due hereon,
including default in the payment of any
applicable late charge, and such default
is continued for a period of one (1)
month, or in case of default in any term
or condition of a Mortgage and Security
Agreement of even date, given as security
herefor, the holder hereof at its option
may declare due and payable at once the

-4-

considerably more detailed, were consistent with the terms

outlined in the First Commitment Letter; but the Note

contained no reference to repayment from the sale of the

mortgaged property or its refinancing.

On the same date, the Bank and Limehouse entered

into a Mortgage and Security Agreement whereby the property

to be purchased by Limehouse for the Coulthard Farms project

was mortgaged to the Bank. One provision of the Mortgage

stated that, "Upon request of Grantor [Limehouse], Grantee

[the Bank] may, at its sole option, from time to time make

further advances to Grantor, provided, however, that the

total principal secured hereby and remaining unpaid,

including any such advances shall not at any time exceed the

sum of Two Million Five Hundred Thousand Dollars

($2,500,000.00)."

On September 7, 1988, the Bank issued a letter of

intent to the Maine Department of Environmental Protection,

vouching for the financial condition of Limehouse and

appellants and stating that the Bank intended to finance the

development of the Coulthard Farms project.

On December 21, 1988, the Bank issued another

commitment letter ("Second Commitment Letter") to Limehouse,

unpaid principal balance hereof, accrued
interest and late charges, as applicable.
The foregoing rights shall be in addition
to the demand right of the holder hereof
after October 1, 1990.

-5-

offering to lend an additional $200,000 for a term of "12

months with interest only to be repaid from the refinancing

of the debt into a residential subdivision development loan."

Appellants accepted the terms and conditions of the Second

Commitment Letter by signing it in their individual

capacities.

On April 12, 1989, Harvey Prawer, as Limehouse

president, executed a promissory note ("Second Note") in the

amount of $200,000 "or so much thereof as may be advanced" to

the Bank. Both Harvey and Gilbert, acting in their

individual capacities, executed the Second Note as co-makers.

Only $100,000 in funds was advanced by the Bank to Limehouse.

The Second Note contained provisions for monthly interest

payments and default substantially identical to those of the

First Note. Like the First Note, the Second Note's terms

were consistent with those outlined in the Second Commitment

Letter, except there was no mention of repaying the interest

from the refinancing of the debt.

Sometime in 1990 Limehouse stopped making the

monthly interest payments due under the First and Second

Notes. The Bank notified Limehouse that it was in default,

but Limehouse did not cure the default. On August 30, 1990,

the Bank filed an action in Maine Superior Court against

Harvey Prawer and Gilbert Prawer, as guarantors of the First

Note and co-makers of the Second Note, seeking payment of the

-6-

principal and unpaid interest on both Notes. (Under the

First Note the Bank alleged it was owed, as of August 9,

1990, $1,000,000 in principal and approximately $32,900

interest; under the Second Note, $100,000 in principal,

$3,100 in interest.) On September 26, 1990, the Prawers

answered the complaint, raised affirmative defenses, and made

counterclaims against the Bank.

Subsequently, Maine Savings Bank failed. The

Federal Deposit Insurance Corporation ("FDIC"), the receiver

of Maine Savings Bank, was substituted as the counterclaim

defendant, and Fleet Bank of Maine ("Fleet"), the purchaser

of the Bank's assets, was substituted as the plaintiff. The

case was removed by the FDIC to the United States District

Court for the District of Maine.

In September 1991, plaintiff Fleet filed a motion

for summary judgment. Counterclaim defendant FDIC filed its

motion for summary judgment in February 1992. The district

court granted both motions on April 3, 1992, finding that the

Prawers' affirmative defenses and counterclaims turned on the

same question: whether the two Commitment Letters issued by

the Bank conditioned repayment of the Notes upon the Bank's

ultimate refinancing of the debt. The district court held

that the D'Oench, Duhme doctrine prevented the Prawers from

using the Commitment Letters to defend against the efforts by

Fleet and the FDIC to collect on the facially unqualified

-7-

Notes. See D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447

(1942). The Prawers appeal from the district court's order.4

II.

We review the district court's grant of summary

judgment de novo, looking at the record in the light most

favorable to appellants. August v. Offices Unlimited, Inc.,

981 F.2d 576, 580 (1st Cir. 1992). The district court based

summary judgment on the D'Oench, Duhme doctrine, but "we need

not limit ourselves to the exact grounds for decision

utilized below. We are free, on appeal, to affirm a judgment

on any independently sufficient ground." Aunyx Corp. v.

Canon U.S.A., Inc., 978 F.2d 3, 6 (1st Cir. 1992) (quoting

Polyplastics, Inc. v. Transconex, Inc., 827 F.2d 859, 860-61

(1st Cir. 1987)), cert. denied, 61 U.S.L.W. 3620 (U.S. Mar.

9, 1993) (No. 92-1205). We do not reach D'Oench, Duhme here

because we find that appellees were entitled to summary

judgment as a matter of Maine contract law.5

Appellants admit that Limehouse stopped making the

monthly interest payments due under the First and Second

Notes, but contend that its obligation to make monthly

4. The district court had jurisdiction over this matter
pursuant to 12 U.S.C. 1819(b)(2)(A) and 28 U.S.C. 1331.
This court has jurisdiction over this appeal pursuant to 28
U.S.C. 1291.

5. The parties agree that Maine law governs their
respective rights and obligations, outside of the question of
application of the federal D'Oench, Duhme doctrine.

-8-

interest payments and repay the principal of the First and

Second Notes was conditioned upon a promise by the Bank to

provide financing for the development. While no such promise

is to be found in the provisions of either Note, appellants

point to the Commitment Letters as establishing such a

promise. Because the First Commitment Letter stated that,

"This loan shall be repaid from the sale of the mortgaged

property or its refinancing into a residential subdivision

development loan," appellants say that the repayment

obligations under the First Note were wholly contingent upon

the Bank's providing new financing for development of the

property. Because the Second Note described the loan term

as, "12 months with interest only to be repaid from the

refinancing of the debt into a residential subdivision

development loan," appellants contend that Limehouse's

obligations under the Second Note were likewise contingent

upon the Bank's providing of refinancing. Appellants further

insist that interpretation of the Notes is insulated from

summary judgment disposition as it is a mixed question of law

and fact.

A major problem with appellants' approach is that,

under Maine contract law, a court does not consider extrinsic

evidence in interpreting a contract unless the language of

the contract is ambiguous. Portland Valve, Inc. v. Rockwood

Systems Corp., 460 A.2d 1383, 1387 (Me. 1983).

-9-

The issue of whether contract
language is ambiguous is a question of
law for the Court. The interpretation of
an unambiguous written contract is a
question of law for the Court; the
interpretation of ambiguous language is a
question for the factfinder. The
interpretation of an unambiguous writing
must be determined from the plain meaning
of the language used and from the four
corners of the instrument without resort
to extrinsic evidence. Once an ambiguity
is found then extrinsic evidence may be
admitted and considered to show the
intention of the parties. Contract
language is ambiguous when it is
reasonably susceptible of different
interpretations.

Id. (citations omitted); see also Triple-A Baseball Club

Assoc. v. Northeastern Baseball, Inc., 832 F.2d 214, 220-21

(1st Cir. 1987) (summarizing Maine law of contract

interpretation), cert. denied, 485 U.S. 935 (1988). Here the

contract terms the repayment terms contained within the

four corners of the Notes are not at all ambiguous. In no

relevant way are they "reasonably susceptible of different

interpretations." Portland Valve, 460 A.2d at 1387. The

repayment terms are clear and unconditional: the maker of the

Note is obligated to make monthly interest payments; failure

to make interest payments constitutes a default; if the

grantor defaults, the grantee may demand full repayment of

the principal sum and accrued interest. There is no hint in

the Notes' language that the Bank's extension of refinancing

is a condition to full repayment upon default. Because the

Notes are unambiguous, appellants may not rely on the

-10-

Commitment Letters to show that the terms of the Notes

differed from their plain meaning. Id.

Appellants argue that the Commitment Letters were

incorporated into the Notes and thus the Letters' terms,

including the Letters' references to refinancing, should be

considered as part and parcel of the parties' agreement. The

Letters were entirely incorporated into the Notes, it is

contended, because the Notes "referred to" the Mortgage and

the Mortgage "referred to" the First Commitment Letter. This

overlooks the limited nature of the cross-references. None

of the documents in question, nor anything else in the

record, suggests that the parties intended to incorporate

everything said in the Commitment Letters as conditions of

the Notes. The Notes provided that Limehouse would be in

default of the Note if it defaulted on its obligations under

the Mortgage and Security Agreement. The Mortgage and

Security Agreement stated that Limehouse must perform

whatever obligations it had under the terms of the First

Commitment Letter. Neither of these references says anything

about the requirement of monthly interest payments, the

provision of the Note as to which Limehouse defaulted.

Nothing is anywhere said that a failure by the Bank to meet

its purported refinancing assurances in the Commitment

Letters will constitute a defense to the borrower's default

upon the Notes.

-11-

The Notes are at least partially integrated

agreements for purposes of the parol evidence rule. They

appear on their face to express the parties' final agreement

as to the terms for Limehouse's repayment of the funds

advanced. See Interstate Indus. Uniform Rental Serv., Inc.

v. Lepage Bakery, Inc., 413 A.2d 516, 519-20 (Me. 1980)

(applying test for integrated agreements and stating that

question of integration is determined by the court);

Restatement (Second) of Contracts 209, 210 (1981). Signed

by both parties, the Notes contain detailed terms and

conditions for repayment of the interest and principal of the

loans, specifying schedules for repayment, penalties for late

payments, calculation of the interest rate, and processes for

handling defaults. See Restatement (Second) of Contracts

209(3) ("Where the parties reduce an agreement to a writing

which in view of its completeness and specificity reasonably

appears to be a complete agreement, it is taken to be an

integrated agreement unless it is established by other

evidence that the writing did not constitute a final

expression.") The lack of specificity in the Commitment

Letters in addition to the time delay between issuance of

the Letters and execution of the Notes (two weeks between the

First Letter and First Note, four months between the Second

Letter and Note) strongly suggests that the parties

-12-

intended the Notes, not the Letters, to be the final

expressions of the repayment terms.

"A binding integrated agreement discharges prior

agreements to the extent that it is inconsistent with them."

Restatement (Second) of Contracts 213(1); Astor v. Boulos

Co., 451 A.2d 903, 905 (Me. 1982) (applying Restatement

213). If the references in the Commitment Letters to

"refinancing" mean what appellants claim they mean that

the parties agreed to make Limehouse's obligation to repay

the loans contingent on refinancing of the debt then to

that extent the Letters are inconsistent, prior agreements

which are discharged by the partially integrated agreements,

i.e., the Notes. See Astor, 451 A.2d at 905-06.

In connection with their counterclaims, appellants

have urged that the Bank breached the terms of a binding

contract when it failed to provide development financing and

so caused an unspecified amount of financial damage to

appellants. In support of this contention, appellants assert

that the Bank "knew" and the parties "understood" that the

Bank would make a development loan in the future. "Mere

allegations, or conjecture unsupported in the record, are

insufficient to raise a genuine issue of material fact."

August, 981 F.2d at 580. To avoid summary judgment, they

"must be able to point to specific, competent evidence" in

support of their claims. Id.

-13-

Appellants point to only a few isolated fragments

of evidence to establish the existence of the contract they

assert: (1) the sentences in the two Commitment Letters which

refer to "refinancing"; (2) the Bank's statement in its

letter to the Maine Department of Environmental Protection

that it was the Bank's "intention to finance the development

of this project, once all requisite approvals are in place.";

(3) the Mortgage and Security Agreement's provision that the

Bank could, "at its sole option," advance up to $2,500,000 to

Limehouse upon its request; and (4) oral statements by Bank

officials on May 22, 1990, indicating that the Bank had

changed its plans and decided not to loan Limehouse any more

than the $1,200,000 already extended.

"For there to be a contract under Maine law, the

parties must have manifested their mutual assent to all of

the material terms of the agreement." Maine Surgical Supply

Co. v. Intermedics Orthopedics, Inc., 756 F. Supp. 597, 602

(D. Me. 1991); Ouellette v. Bolduc, 440 A.2d 1042, 1045 (Me.

1982). "The terms of the contract must be reasonably

certain, such that they provide a basis for determining the

existence of a breach and for giving an appropriate remedy."

Maine Surgical Supply Co., 756 F. Supp. at 602; Roy v. Danis,

553 A.2d 663, 664 (Me. 1989). The asserted facts appellants

rely upon are wholly inadequate to show the existence of a

legally binding contract by the Bank to provide financing

-14-

beyond the two loans made. Unlike the loans for $1,000,000

and $200,000, there is no commitment letter in the record

which bound the Bank to providing development financing to

Limehouse. Nothing is offered by appellants to show the loan

amount, interest rate, period of repayment, repayment terms,

conditions, or other material terms of the alleged agreement

for this financing. Mere declarations of intention to enter

into a future agreement which is, at most, what the

statements in the Commitment Letters and in the letter to the

Maine Department of Environmental Protection are do not

create a binding contract. Maine Surgical Supply Co., 756 F.

Supp. at 602. Appellants failed to establish a genuine issue

of material fact over the existence of a binding agreement

obligating the Bank to provide financing beyond the two loans

made.

III.

In sum, the record is without material facts which,

viewed in the light most favorable to appellants, would

create a genuine issue under Maine contract law as to whether

Limehouse could justifiably refuse to pay the amounts due

under the Notes because of the Bank's nonperformance of its

claimed obligation, as a condition to collection of its

-15-

Notes, to have provided development financing.6 Without

need to inquire into the application here of the D'Oench,

Duhme doctrine, we rule as a matter of Maine contract law

that appellees were entitled to summary judgment in their

favor.

Affirmed. Costs to appellees.

6. We have considered all of appellants' other arguments,
mostly variations on the same theme, and find no merit in
them.

-16-