USCA1 Opinion

 

 April 7, 1993 [NOT FOR PUBLICATION] UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-1740 FLEET BANK OF MAINE, Plaintiff, Appellee, v. HARVEY E. PRAWER and GILBERT PRAWER, Defendants, Counterclaim Plaintiffs, Appellants, and FEDERAL DEPOSIT INSURANCE CORPORATION, Counterclaim Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Gene Carter, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Campbell and Bownes, Senior Circuit Judges. _____________________ ____________________ Joseph J. Hahn with whom Bernstein, Shur, Sawyer & Nelson was on ______________ _________________________________ brief for appellants. Alexandra L. Treadway with whom P. Benjamin Zuckerman and Verrill _____________________ _____________________ _______ & Dana were on brief for appellees. ______ ____________________ ____________________ CAMPBELL, Senior Circuit Judge. Maine Savings Bank ____________________ brought this action against appellants, Harvey E. Prawer and Gilbert Prawer, to collect money owed to it under two promissory notes the appellants had personally guaranteed. The bank alleged that Limehouse Corporation ("Limehouse"), of which Harvey Prawer was the president, defaulted on the notes when it stopped making monthly interest payments.1 Appellants argued below, as the basis of their affirmative defenses and their counterclaims against the bank, that Limehouse stopped making payments because the bank had reneged on an agreement to provide even more financing for their real estate project. The United States District Court for the District of Maine granted summary judgment for the bank's successors in interest, appellees Fleet Bank of Maine and the FDIC, and we affirm. I. I. The district court found the following facts to be undisputed. In 1987 appellants Harvey and Gilbert Prawer, on behalf of Limehouse, of which Harvey Prawer was president, began negotiations with Maine Savings Bank ("the Bank") for the financing of the purchase and development of 122 acres of ____________________ 1. Limehouse Corporation is not a party to this action. The bank sued only Harvey E. Prawer and Gilbert Prawer in their individual capacities, as guarantors of one promissory note and co-makers of the other. land in Scarborough, Maine. Appellants planned to subdivide the property and market it as a planned residential community known as "Coulthard Farms." At the time of the negotiations, the total cost of the project was estimated to be $2,500,000, consisting of $1,000,000 for the purchase of the real estate and $1,500,000 for the construction of the infrastructure roads, sewers, water supply and other structures needed to transform the land into a residential community. On October 1, 1987, the Bank issued a commitment letter ("First Commitment Letter"), in which it offered to lend $1,000,000 to Limehouse for purchase of the Coulthard Farms property, for a term of "36 months, on demand thereafter," at an adjustable rate, initially 10.50%. The Letter specified that interest payments were to be made monthly. By signing the Letter, Harvey Prawer agreed on behalf of Limehouse to borrow the money "in accordance with the [] terms and conditions" of the Letter, including granting the Bank a mortgage on the property. One paragraph of the four-page letter of terms and conditions said, "This loan shall be repaid from the sale of the mortgaged property or its refinancing into a residential subdivision development loan." On October 15, 1987, Harvey Prawer, as president of Limehouse, executed a promissory note ("First Note") in the amount of $1,000,000 to the Bank. Both Harvey and Gilbert -3- Prawer, acting in their individual capacities, executed an unconditional guaranty of the First Note. The First Note obligated Limehouse to make monthly payments of the interest due and to repay the principal sum on demand after October 1, 1990.2 A default provision defined "default" as including failure to pay any installment of the interest due and authorized the holder of the Note, in addition to the right to demand payment after October 1, 1990, to declare the Note immediately due and payable in full in the event of a default.3 The provisions of the First Note, while ____________________ 2. The First Note provided, in part: For Value Received, On Demand after October 1, 1990, the undersigned promises to pay to the order of Maine Savings Bank, a Maine banking corporation, the sum of One Million Dollars ($1,000,000.00), or so much thereof as may be advanced, together with interest upon the principal sum thereof from time to time advanced, . . . ; which interest at said rates shall be paid monthly in arrears on the first day of each succeeding month hereafter, with a final payment of interest when the indebtedness evidenced hereby is paid in full. 3. The default provision of the First Note provided: In case of default in the payment of any installment of interest due hereon, including default in the payment of any applicable late charge, and such default is continued for a period of one (1) month, or in case of default in any term or condition of a Mortgage and Security Agreement of even date, given as security herefor, the holder hereof at its option may declare due and payable at once the -4- considerably more detailed, were consistent with the terms outlined in the First Commitment Letter; but the Note contained no reference to repayment from the sale of the mortgaged property or its refinancing. On the same date, the Bank and Limehouse entered into a Mortgage and Security Agreement whereby the property to be purchased by Limehouse for the Coulthard Farms project was mortgaged to the Bank. One provision of the Mortgage stated that, "Upon request of Grantor [Limehouse], Grantee [the Bank] may, at its sole option, from time to time make further advances to Grantor, provided, however, that the total principal secured hereby and remaining unpaid, including any such advances shall not at any time exceed the sum of Two Million Five Hundred Thousand Dollars ($2,500,000.00)." On September 7, 1988, the Bank issued a letter of intent to the Maine Department of Environmental Protection, vouching for the financial condition of Limehouse and appellants and stating that the Bank intended to finance the development of the Coulthard Farms project. On December 21, 1988, the Bank issued another commitment letter ("Second Commitment Letter") to Limehouse, ____________________ unpaid principal balance hereof, accrued interest and late charges, as applicable. The foregoing rights shall be in addition to the demand right of the holder hereof after October 1, 1990. -5- offering to lend an additional $200,000 for a term of "12 months with interest only to be repaid from the refinancing of the debt into a residential subdivision development loan." Appellants accepted the terms and conditions of the Second Commitment Letter by signing it in their individual capacities. On April 12, 1989, Harvey Prawer, as Limehouse president, executed a promissory note ("Second Note") in the amount of $200,000 "or so much thereof as may be advanced" to the Bank. Both Harvey and Gilbert, acting in their individual capacities, executed the Second Note as co-makers. Only $100,000 in funds was advanced by the Bank to Limehouse. The Second Note contained provisions for monthly interest payments and default substantially identical to those of the First Note. Like the First Note, the Second Note's terms were consistent with those outlined in the Second Commitment Letter, except there was no mention of repaying the interest from the refinancing of the debt. Sometime in 1990 Limehouse stopped making the monthly interest payments due under the First and Second Notes. The Bank notified Limehouse that it was in default, but Limehouse did not cure the default. On August 30, 1990, the Bank filed an action in Maine Superior Court against Harvey Prawer and Gilbert Prawer, as guarantors of the First Note and co-makers of the Second Note, seeking payment of the -6- principal and unpaid interest on both Notes. (Under the First Note the Bank alleged it was owed, as of August 9, 1990, $1,000,000 in principal and approximately $32,900 interest; under the Second Note, $100,000 in principal, $3,100 in interest.) On September 26, 1990, the Prawers answered the complaint, raised affirmative defenses, and made counterclaims against the Bank. Subsequently, Maine Savings Bank failed. The Federal Deposit Insurance Corporation ("FDIC"), the receiver of Maine Savings Bank, was substituted as the counterclaim defendant, and Fleet Bank of Maine ("Fleet"), the purchaser of the Bank's assets, was substituted as the plaintiff. The case was removed by the FDIC to the United States District Court for the District of Maine. In September 1991, plaintiff Fleet filed a motion for summary judgment. Counterclaim defendant FDIC filed its motion for summary judgment in February 1992. The district court granted both motions on April 3, 1992, finding that the Prawers' affirmative defenses and counterclaims turned on the same question: whether the two Commitment Letters issued by the Bank conditioned repayment of the Notes upon the Bank's ultimate refinancing of the debt. The district court held that the D'Oench, Duhme doctrine prevented the Prawers from ______________ using the Commitment Letters to defend against the efforts by Fleet and the FDIC to collect on the facially unqualified -7- Notes. See D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447 ___ ______________________ ____ (1942). The Prawers appeal from the district court's order.4 II. II. We review the district court's grant of summary judgment de novo, looking at the record in the light most __ ____ favorable to appellants. August v. Offices Unlimited, Inc., ______ _______________________ 981 F.2d 576, 580 (1st Cir. 1992). The district court based summary judgment on the D'Oench, Duhme doctrine, but "we need ______________ not limit ourselves to the exact grounds for decision utilized below. We are free, on appeal, to affirm a judgment on any independently sufficient ground." Aunyx Corp. v. ___________ Canon U.S.A., Inc., 978 F.2d 3, 6 (1st Cir. 1992) (quoting ___________________ _______ Polyplastics, Inc. v. Transconex, Inc., 827 F.2d 859, 860-61 __________________ _________________ (1st Cir. 1987)), cert. denied, 61 U.S.L.W. 3620 (U.S. Mar. ____________ 9, 1993) (No. 92-1205). We do not reach D'Oench, Duhme here _______________ because we find that appellees were entitled to summary judgment as a matter of Maine contract law.5 Appellants admit that Limehouse stopped making the monthly interest payments due under the First and Second Notes, but contend that its obligation to make monthly ____________________ 4. The district court had jurisdiction over this matter pursuant to 12 U.S.C. 1819(b)(2)(A) and 28 U.S.C. 1331. This court has jurisdiction over this appeal pursuant to 28 U.S.C. 1291. 5. The parties agree that Maine law governs their respective rights and obligations, outside of the question of application of the federal D'Oench, Duhme doctrine. ______________ -8- interest payments and repay the principal of the First and Second Notes was conditioned upon a promise by the Bank to provide financing for the development. While no such promise is to be found in the provisions of either Note, appellants point to the Commitment Letters as establishing such a promise. Because the First Commitment Letter stated that, "This loan shall be repaid from the sale of the mortgaged property or its refinancing into a residential subdivision development loan," appellants say that the repayment obligations under the First Note were wholly contingent upon the Bank's providing new financing for development of the property. Because the Second Note described the loan term as, "12 months with interest only to be repaid from the refinancing of the debt into a residential subdivision development loan," appellants contend that Limehouse's obligations under the Second Note were likewise contingent upon the Bank's providing of refinancing. Appellants further insist that interpretation of the Notes is insulated from summary judgment disposition as it is a mixed question of law and fact. A major problem with appellants' approach is that, under Maine contract law, a court does not consider extrinsic evidence in interpreting a contract unless the language of the contract is ambiguous. Portland Valve, Inc. v. Rockwood ____________________ ________ Systems Corp., 460 A.2d 1383, 1387 (Me. 1983). _____________ -9- The issue of whether contract language is ambiguous is a question of law for the Court. The interpretation of an unambiguous written contract is a question of law for the Court; the interpretation of ambiguous language is a question for the factfinder. The interpretation of an unambiguous writing must be determined from the plain meaning of the language used and from the four corners of the instrument without resort to extrinsic evidence. Once an ambiguity is found then extrinsic evidence may be admitted and considered to show the intention of the parties. Contract language is ambiguous when it is reasonably susceptible of different interpretations. Id. (citations omitted); see also Triple-A Baseball Club ___ _________ _______________________ Assoc. v. Northeastern Baseball, Inc., 832 F.2d 214, 220-21 ______ ___________________________ (1st Cir. 1987) (summarizing Maine law of contract interpretation), cert. denied, 485 U.S. 935 (1988). Here the ____________ contract terms the repayment terms contained within the four corners of the Notes are not at all ambiguous. In no relevant way are they "reasonably susceptible of different interpretations." Portland Valve, 460 A.2d at 1387. The _______________ repayment terms are clear and unconditional: the maker of the Note is obligated to make monthly interest payments; failure to make interest payments constitutes a default; if the grantor defaults, the grantee may demand full repayment of the principal sum and accrued interest. There is no hint in the Notes' language that the Bank's extension of refinancing is a condition to full repayment upon default. Because the Notes are unambiguous, appellants may not rely on the -10- Commitment Letters to show that the terms of the Notes differed from their plain meaning. Id. ___ Appellants argue that the Commitment Letters were incorporated into the Notes and thus the Letters' terms, including the Letters' references to refinancing, should be considered as part and parcel of the parties' agreement. The Letters were entirely incorporated into the Notes, it is contended, because the Notes "referred to" the Mortgage and the Mortgage "referred to" the First Commitment Letter. This overlooks the limited nature of the cross-references. None of the documents in question, nor anything else in the record, suggests that the parties intended to incorporate everything said in the Commitment Letters as conditions of the Notes. The Notes provided that Limehouse would be in _________ default of the Note if it defaulted on its obligations under ___ the Mortgage and Security Agreement. The Mortgage and Security Agreement stated that Limehouse must perform _________ whatever obligations it had under the terms of the First __ Commitment Letter. Neither of these references says anything about the requirement of monthly interest payments, the provision of the Note as to which Limehouse defaulted. Nothing is anywhere said that a failure by the Bank to meet its purported refinancing assurances in the Commitment Letters will constitute a defense to the borrower's default upon the Notes. -11- The Notes are at least partially integrated agreements for purposes of the parol evidence rule. They appear on their face to express the parties' final agreement as to the terms for Limehouse's repayment of the funds advanced. See Interstate Indus. Uniform Rental Serv., Inc. ___ _____________________________________________ v. Lepage Bakery, Inc., 413 A.2d 516, 519-20 (Me. 1980) ____________________ (applying test for integrated agreements and stating that question of integration is determined by the court); Restatement (Second) of Contracts 209, 210 (1981). Signed by both parties, the Notes contain detailed terms and conditions for repayment of the interest and principal of the loans, specifying schedules for repayment, penalties for late payments, calculation of the interest rate, and processes for handling defaults. See Restatement (Second) of Contracts ___ 209(3) ("Where the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression.") The lack of specificity in the Commitment Letters in addition to the time delay between issuance of the Letters and execution of the Notes (two weeks between the First Letter and First Note, four months between the Second Letter and Note) strongly suggests that the parties -12- intended the Notes, not the Letters, to be the final expressions of the repayment terms. "A binding integrated agreement discharges prior agreements to the extent that it is inconsistent with them." Restatement (Second) of Contracts 213(1); Astor v. Boulos _____ ______ Co., 451 A.2d 903, 905 (Me. 1982) (applying Restatement ___ 213). If the references in the Commitment Letters to "refinancing" mean what appellants claim they mean that the parties agreed to make Limehouse's obligation to repay the loans contingent on refinancing of the debt then to that extent the Letters are inconsistent, prior agreements which are discharged by the partially integrated agreements, i.e., the Notes. See Astor, 451 A.2d at 905-06. ___ _____ In connection with their counterclaims, appellants have urged that the Bank breached the terms of a binding contract when it failed to provide development financing and so caused an unspecified amount of financial damage to appellants. In support of this contention, appellants assert that the Bank "knew" and the parties "understood" that the Bank would make a development loan in the future. "Mere allegations, or conjecture unsupported in the record, are insufficient to raise a genuine issue of material fact." August, 981 F.2d at 580. To avoid summary judgment, they ______ "must be able to point to specific, competent evidence" in support of their claims. Id. ___ -13- Appellants point to only a few isolated fragments of evidence to establish the existence of the contract they assert: (1) the sentences in the two Commitment Letters which refer to "refinancing"; (2) the Bank's statement in its letter to the Maine Department of Environmental Protection that it was the Bank's "intention to finance the development of this project, once all requisite approvals are in place."; (3) the Mortgage and Security Agreement's provision that the Bank could, "at its sole option," advance up to $2,500,000 to Limehouse upon its request; and (4) oral statements by Bank officials on May 22, 1990, indicating that the Bank had changed its plans and decided not to loan Limehouse any more than the $1,200,000 already extended. "For there to be a contract under Maine law, the parties must have manifested their mutual assent to all of the material terms of the agreement." Maine Surgical Supply _____________________ Co. v. Intermedics Orthopedics, Inc., 756 F. Supp. 597, 602 ___ _____________________________ (D. Me. 1991); Ouellette v. Bolduc, 440 A.2d 1042, 1045 (Me. _________ ______ 1982). "The terms of the contract must be reasonably certain, such that they provide a basis for determining the existence of a breach and for giving an appropriate remedy." Maine Surgical Supply Co., 756 F. Supp. at 602; Roy v. Danis, _________________________ ___ _____ 553 A.2d 663, 664 (Me. 1989). The asserted facts appellants rely upon are wholly inadequate to show the existence of a legally binding contract by the Bank to provide financing -14- beyond the two loans made. Unlike the loans for $1,000,000 and $200,000, there is no commitment letter in the record which bound the Bank to providing development financing to Limehouse. Nothing is offered by appellants to show the loan amount, interest rate, period of repayment, repayment terms, conditions, or other material terms of the alleged agreement for this financing. Mere declarations of intention to enter into a future agreement which is, at most, what the statements in the Commitment Letters and in the letter to the Maine Department of Environmental Protection are do not create a binding contract. Maine Surgical Supply Co., 756 F. _________________________ Supp. at 602. Appellants failed to establish a genuine issue of material fact over the existence of a binding agreement obligating the Bank to provide financing beyond the two loans made. III. III. In sum, the record is without material facts which, viewed in the light most favorable to appellants, would create a genuine issue under Maine contract law as to whether Limehouse could justifiably refuse to pay the amounts due under the Notes because of the Bank's nonperformance of its claimed obligation, as a condition to collection of its -15- Notes, to have provided development financing.6 Without need to inquire into the application here of the D'Oench, ________ Duhme doctrine, we rule as a matter of Maine contract law _____ that appellees were entitled to summary judgment in their favor. Affirmed. Costs to appellees. ________ __________________ ____________________ 6. We have considered all of appellants' other arguments, mostly variations on the same theme, and find no merit in them. -16-